**In re Linda THOMAS, Debtor.**

**CENTRAL BANK OF THE SOUTH, Plaintiff,**

v.

**Linda THOMAS, Defendant.**

**Bankruptcy No. BK 87–05834.**

United States Bankruptcy Court, N.D. Alabama, W.D.

Oct. 29, 1990.

Claude M. Burns, Tuscaloosa, Ala., for debtor/defendant.

Robert H. Adams, Birmingham, Ala., for plaintiff.

## MEMORANDUM OF DECISION

GEORGE S. WRIGHT, Chief Judge.

This matter came before the Court on a Motion for Relief from the Automatic Stay filed by Central Bank of the South on July 2, 1990. A preliminary hearing was held on that motion July 17, 1990. Following that hearing, this Court issued an order July 17, 1990 which allowed the Bank a fixed payment of $217.27 per month on current mortgage payments (long-term debt under 11 U.S.C. § 1322(b)(5)). The order also increased the Debtor's payments to the Court to $315.00 per month beginning immediately.

Subsequently, in two separate final hearings, testimony was in conflict on the name on the deed of record for the real estate which is at issue. The Bank contended that Ms. Linda Thomas quitclaimed away her interest in the property. Ms. Thomas contended her estranged husband, Ray A. Richards, forged her name to the quitclaim deed and recorded it without her approval or knowledge.

However, both sides to the issue presented evidence that the Debtor had occupied this residence in The Glen subdivision, and had made all payments which were made to Central Bank over the fifteen months immediately preceding the hearings. Therefore, the Court, having considered those facts in evidence which seem uncontroverted and the applicable law, finds that Central Bank's motion is due to be DENIED. Debtor's oral motion to modify the plan to include post-petition arrearage on this indebtedness is due to be GRANTED. This memorandum shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## FINDINGS OF FACT

On November 7, 1986, Ray A. Richards and Linda Thomas executed a note for $14,000.00, and a mortgage on the house and lot at 3521 36th Avenue, Tuscaloosa, Alabama, (Lot 132, The Glen subdivision) se-curing that note, to Central Bank of the South. The mortgage listed both parties as single.

Later, when payments fell into default, the Bank sent out collection letters to the two parties twice—letters dated September 14, 1987, and September 19, 1989. The letters to Ms. Thomas were mailed to a different address than that of the residence in The Glen encumbered by the mortgage. Mr. Richards' letters were mailed to the address of the mortgaged property.

Ms. Thomas, listing a post office address of 1605 Fifteenth Street East, and stating she lived with a relative in her Chapter 13 statement, had filed a petition for reorganization under Chapter 13 of 11 U.S.C. on July 2, 1987. Ms. Thomas' reorganization plan proposed to pay one (1) percent of her obligations to unsecured creditors; 100 percent to secured creditors and was confirmed (as amended to an eight percent plan) on November 12, 1987.

Ms. Thomas listed her marital status as "divorced" on her Chapter 13 statement and answered the question blanks on her spouse's name and income as "N/A." She listed Social Security disability, $682.00 per month, as her sole source of income and listed two children as dependents.

According to documents on file in her Chapter 13 case and to testimony taken at final hearings on this Motion for Relief from Stay on August 14, 1990, and September 11, 1990, Ms. Thomas did not claim the house located at 3521 36th Avenue in The Glen as an asset nor list Central Bank of the South as a creditor in her plan in 1987. Ms. Thomas contended at the August 14, 1990 hearing that she thought this was unnecessary because she thought her husband, Ray Anthony Richards, had listed the debt/asset as part of his Chapter 13 case.

Central Bank had not filed a proof of claim against Ms. Thomas by the time of the September 11, 1990 hearing. Mary Jane Harrell, administrative coordinator for Central Bank of the South, testified August 14, 1990, that the Bank had no notice of Ms. Thomas' bankruptcy until after this Court lifted the automatic stay

with regard to Mr. Richards' bankruptcy case.

On March 16, 1988, Ray A. Richards had also filed for reorganization under Chapter 13 of 11 U.S.C. Mr. Richards listed the house in The Glen as his residential address on his bankruptcy papers. He listed Central Bank of the South as a secured creditor for its mortgage on Lot 132, The Glen, listing the balance owed at $14,178.06 and arrearage at $716.00. Mr. Richards listed himself as "separated" on his Chapter 13 statement but answered "N/A" in the blank for spouse's name. He said on the statement that he was paying $112.00 per month in support.

He listed net biweekly earnings of $310.00 from his job at Bryce Hospital where he said he had worked for 16 years. A confirmation order on Richards' plan in which he proposed to pay his creditors 100 percent of his obligation was ordered May 10, 1988.

On March 28, 1988, Central Bank of the South filed the first of three Motions for Relief from Stay in Richards' bankruptcy. Following a March 29, 1988 hearing, the motion was denied, and limited relief granted in the Court's confirmation order. In that plan, this Court provided a $25.00–per–month payment to Central Bank of the South on its arrearage, approved the Debtor's proposal to continue paying the regular monthly payments to the bank and granted the Bank limited relief from the automatic stay to contact the debtor by mail or telephone about payments due post-petition.

On November 9, 1989, Central Bank of the South once again filed a Motion for Relief from the Automatic Stay in order to enforce its security interest against the house in The Glen. At that point, the Bank said Mr. Richards was in default for three months' payments. This Court denied the Motion for Relief from Stay on January 12, 1990.

On April 12, 1990, the Bank filed its third Motion for Relief from Stay in the Richards bankruptcy case, claiming delinquency of three months payments on the house in The Glen. On June 11, 1990, this Court granted the Bank the relief it sought.

The Bank filed its Motion for Relief from Stay in Ms. Thomas' Chapter 13 case on July 2, 1990. Following the preliminary hearing, this Court entered the order adding the Bank's regular $217.27 mortgage payment to Ms. Thomas' Chapter 13 plan, increasing her monthly payment to the Trustee to cover it, and set the case for final hearing.

Central Bank brought out in the August 14, 1990 hearing that it was Ms. Thomas, not Mr. Richards, who had appeared at hearings on the previous motions to ask an opportunity to cure the default in his case. Apparently, when the Bank sought to enforce the security interest after the relief order in Richards' case, it learned of Ms. Thomas' bankruptcy case. Ms. Thomas told the Court she had occupied the house for about three years, that Richards moved out approximately a year or more prior to the August 14, 1990 hearing, and that she had been making payments to Central Bank since that time.

At the hearing on August 14, 1990, Counsel for the Bank introduced into evidence a certified copy of a quitclaim deed recorded in the Tuscaloosa County Probate Judge's Office on September 10, 1987. The deed purported to convey all of Ms. Linda Thomas' interest in Lot No. 132 The Glen to Richards. The deed bore signatures "Ray A. Richards" and "Linda Thomas" and is dated September 8, 1987.

Ms. Thomas, in testimony at the hearing, denied that she had signed the conveyance. She said, in effect, that Mr. Richards had falsified the deed in an attempt to get a loan without her signature, that she did not know he had recorded the deed at the Courthouse. She indicated Mr. Richards was having financial difficulties because of a drug problem. Ms. Thomas said at one point, Richards tried to get her to give him $200.00 to put her name back on the property, but that she had not believed he had "taken her name off" the property.

The notary who witnessed the signature purported to be Ms. Thomas' was out of the country through September of 1990.

So the Bank was not able to produce her for either the August 14, 1990 hearing, or the subsequent September 11, 1990 hearing. The Bank did not seek further continuance so this witness could testify, however. At the September hearing, the Bank presented testimony from Mr. Richards in which he said his estranged wife did sign the 1987 quitclaim deed.

At the second hearing, the Bank also offered testimony from Joe H. Farley, manager of City Finance Co. in Tuscaloosa, who had assisted at the closing of a $6,480.00 loan secured by a second mortgage on the house in The Glen. Farley said if Ms. Thomas were in the Courtroom he could identify her as the person who signed the papers in that loan. However, Ms. Thomas was not present for this hearing.

City Finance's mortgage on the property was granted by "Ray A. Richards and wife, Patricia A. Thomas Richards a/k/a Linda Thomas" and signed by them September 30, 1987, the same month of the purported quitclaim conveyance. (In fact, the quitclaim deed's recordation is noted on the City Finance mortgage).

Consequently, neither side offered neutral, authoritative and disinterested testimony on the issue of the genuineness of Ms. Thomas signature on the deed. Ms. Thomas contended on the stand she did not sign the deed; Mr. Richards contended on the stand that she signed the deed in his presence. The record is confused and in conflict on this issue.

Mr. Richards said he acquired his interest in the house sixteen years ago, that he had made its payments for 13 years. Then, he testified, he had let Ms. Thomas make the payments because she was living there. Mr. Richards said the he had been out of the house since May of 1989, and in that time, he made no payments to Central Bank—other than indirectly by some money he gave Ms. Thomas.

By the time of the second hearing, the Bank claimed an arrearage of five months with payments of $217.27 plus $55.69 late charges. Ms. Harrell in her testimony August 14, 1990, stated that the Bank's pay-off as of that point was $15,440.02. She said the property was appraised for the Bank at $22,400.00 if it were sold at a distress sale; at a $32,000.00 fair market value, otherwise. Thus the Bank then had an equity cushion of $6,959.98 in this property even if sold at distress sale—more than six times the arrearage of $1086.35; an equity cushion of $16,559.98 if the property sold at fair market value—more than 100 percent of its total debt.

The Bank accepted its last payment from Ms. Thomas in July of 1990 and applied the funds to the overdue April payment, Ms. Harrell testified.

Central Bank of the South contended its Motion for Relief from Stay should be granted because it said Ms. Thomas had no interest in the property, that she neither claimed the house as an asset nor listed the bank as a creditor in her Chapter 13 plan, and that there had been repeated post-petition defaults on the loan.

Counsel for the Debtor contended that, at the very least, Ms. Thomas had an interest in the house due to the fact that she has made payments on the note secured by the mortgage and has occupied the dwelling with her children for some years.

On September 12, 1990, this Court entered an order denying the Bank's Motion for Relief from Stay as well as granting an oral motion by the Debtor to modify the plan to include the post-petition arrearage to Central Bank of the South. In that second order, the Court granted the Bank a fixed payment of $35.00 per month on the five months of mortgage arrearage totalling $1,086.35, upon its filing a properly perfected proof of claim.

On September 20, 1990, the Debtor's Counsel filed proof of claim for the Bank as allowed under 11 U.S.C. § 501(c). Central Bank of the South served timely notice of appeal to the United States District Court for the Northern District of Alabama Western Division on September 19, 1990.

## CONCLUSIONS OF LAW

The Court must analyze the dispute between Ms. Thomas and the Bank along three lines of inquiry:

I. Despite the conflict in the record on the state of the recorded title, does Ms. Thomas' have a property interest in the house in The Glen?

II. If Ms. Thomas' rights in the house in The Glen are a valid property interest, may she then cure the post-petition default by a modification of her Chapter 13 plan?

III. Finally, is Central Bank of the South entitled to relief from stay under Section 362(d)?

It is the view of this Court that Ms. Thomas has an equitable interest her home in The Glen and that nothing in the Bankruptcy Code prevents a modification of her Chapter 13 plan to cure the post-petition default on her mortgage. It is the further opinion of the Court that the Bank should be denied relief from stay to repossess in these circumstances.

## I.

## MS. THOMAS' RIGHTS IN THE HOUSE IN THE GLEN COMPRISE A VALID PROPERTY INTEREST.

The record of this case shows evidence, both testamentary and documentary, which is sometimes in conflict and often in confusion. It is the task of the Court to sort through this morass to determine mixed questions of law and fact, to weigh the merits of the courtroom testimony and to evaluate the written record in the context of the applicable law.

Central Bank of the South spent much of two hearing dates attempting to prove that Ms. Thomas signed a quitclaim deed giving up her interest in the house in The Glen to Ray A. Richards. (To obtain relief from the automatic stay under 11 U.S.C. § 362(d)(2), one of the elements that a creditor must prove is that the debtor has no equity in the collateral).

The two witnesses offered as proof of the matter, one by the Debtor, one by the Creditor, directly contradicted each other. Ms. Thomas said she never signed the deed; Mr. Richards said she did—in his presence. However, the Bank failed to produce the one uninterested witness who might have testified conclusively and neutrally to the fact of the matter—the notary public who witnessed execution of the deed.

Uncontroverted evidence establishes the following timetable: Ms. Thomas executed Central Bank of the South's mortgage as an owner of the property November 7, 1986; Ms. Thomas filed her Chapter 13 petition July 2, 1987; the purported quitclaim deed is dated September 8, 1987; Ms. Thomas' Chapter 13 plan was confirmed November 12, 1987; Ms. Thomas and her two young children have occupied the house for some years; and Ms. Thomas has made payments on the house in recent years, the last in July of 1990, the month the Bank's motion to lift stay was filed.

The Bank has failed to prove to the satisfaction of the Court that the signature on the quitclaim deed is authentic. And even if it were, the facts of this situation show that Ms. Thomas had the type of equitable interest which should be recognized by the Bankruptcy Code.

## A. THE BANKRUPTCY ESTATE COMPRISES ALL LEGAL AND EQUITABLE INTERESTS OF THE DEBTOR.

11 U.S.C. § 541(a)(1) provides that the bankruptcy estate shall be comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." That includes all property "wherever located and by whomever held."

Additionally, in a Chapter 13 case, property of the estate includes all property acquired by the debtor during the course of the case before it is closed, dismissed or converted to a case under Chapter 7. 11 U.S.C. § 1306.

What is property under Section 541(a)(1)? This formulation should be a guideline on the issue of whether Ms. Thomas has a cognizable interest in the property in The Glen. The legislative history of the section directs an expansive view of this definition:

> The scope of this paragraph is broad. It includes all kinds of property, including tangible or intangible property, causes of

action (See Bankruptcy Act § 70a(6), and all other forms of property currently specified in section 70a of the Bankruptcy Act § 70(a), as well as property recovered by the trustee under section 542 of proposed title 11, if the property recovered was merely out of the possession of the debtor, yet remained "property of the debtor." The debtor's interest in property also includes "title" to property, which is an interest, just as are a possessory interest or leasehold interest, for example. (underlining for emphasis)

H.R.Rep. No. 595, 95th Cong., 1st Sess. 367 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 82 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5868, 6323.

The Court of Appeals for the Eleventh Circuit has also adopted that expansive definition of the "legal and equitable interests" comprising property under the Bankruptcy Code:

As the United States Supreme Court has noted, the phrase "all legal and equitable interests of the debtor in property as of the commencement of the case" is to be broadly construed so as to effectuate the intent of Congress that "a broad range of property [ ] be included in the estate." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–205, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983). *Accord in re May*, 83 B.R. 812, 813–14 (Bankr.M.D. Fla.1988); *Matter of Nichols*, 42 B.R. 772, 775–76 (Bankr.M.D.Fla.1984). Under the Bankruptcy Reform Act of 1978, Congress amended the then-existing law to include the above-quoted definition of property of the estate.

*In re Thomas*, 883 F.2d 991, 995 (11th Cir.1989), *cert. denied Thomas v. Southtrust Bank of Alabama*, — U.S. —, 110 S.Ct. 3245, 111 L.Ed.2d 756 (1990).

In another bankruptcy case, *In re Maddox*, 713 F.2d 1526 (11th Cir.1983), a creditor asked the court to agree that "interest" under Section 541(a) meant only the debtor's equity as interest was defined in one portion of the Georgia Code. The Court of Appeals did not agree:

11 U.S.C. § 541(a)(1) specifically refers to "all legal or equitable interests of the debtor in property as of the commence-

ment of the case." This court must reject the appellant's narrow interpretation of the phrase "debtor's interest." The word "interest" is a broad term encompassing many rights of a party, tangible, intangible, legal and equitable, and the court will not redefine the term to reach the result sought by appellant.

*Maddox* at 1530.

The Eleventh Circuit Court also discussed the broad nature of property rights in a decision finding that Alabama's equity of redemption and statutory right of redemption following foreclosure are property rights protected by the Fifth Amendment of the United States Constitution. In *Federal Deposit Insurance Corp. v. Morrison*, 747 F.2d 610 (11th Cir.1984), *cert. denied Morrison v. Federal Deposit Insurance Corp.*, 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985), the court said that the guarantee of due process extends to property rights less substantial than full legal title, whether they come from private contract or state law, that arguably, even a right to possession constitutes a property right.

*In re Saylors*, 869 F.2d 1434 (11th Cir. 1989) re-emphasized this point, saying once more that the equitable right of redemption is a more valuable right than the statutory right under Alabama law and is also a property right of the debtor within the jurisdiction of the bankruptcy courts.

The Court in *Maddox*, noted that when state and federal law conflict, federal law prevails under the supremacy clause, United States Constitution, art VI, cl. 2. Normally, however, when there is no conflict, state law will determine what will be a "legal or equitable" property interest of a debtor. *See In re Livingston*, 804 F.2d 1219, 1221 (11th Cir.1986).

B. MS. THOMAS HAS AN EQUITABLE INTEREST IN THE HOUSE IN THE GLEN.

1. The Bank has failed to prove that Ms. Thomas knowingly signed away her valuable equity of redemption in the house in The Glen.

All either of the mortgagors in this case hold under state law is an eq-

uitable interest since Alabama is a "title theory" (as opposed to "lien theory") state regarding mortgages. As the Court of Appeals for the Eleventh Circuit said:

Under Alabama common law, execution of a mortgage passes legal title to the mortgagee, leaving the mortgagor only his equity of redemption. Payment of the debt revests title in the holder of the equity of redemption, which Alabama treats as a property interest transferrable by deed. Foreclosure marks the end of this property right.

*Federal Deposit Insurance Corp. v. Morrison* at 613. *See also In re Saylors* at 1437.

Since Central Bank of the South failed to prove conclusively that Ms. Thomas knowingly transferred away her equity of redemption, it must be recognized by the Court.

2. Alabama's common law recognizes other legal theories whereby an equitable right is recognized as a valid property interest.

■ Additionally, Alabama's common law has recognized other legal theories whereby a person who holds less than legal title, or an interest not in conformance with the statute of frauds may be vested with a valid property interest.

In *Cole v. Adkins*, 358 So.2d 447 (Ala. 1978) the Supreme Court imposed what it called a constructive trust on property in favor of a deceased landholder's son—though nothing existed in writing to say that he was supposed to receive the property on her death. The son had deeded the land to his mother earlier so she would have a place to live, with an unwritten understanding that it would devolve to him at her death. The court found that the elements required for a constructive trust were present in that situation—1) a mistake to the point that the transferor was entitled to restitution and 2) a confidential relationship between transferor and transferee. Such is the situation between Ms. Thomas and Mr. Richards.

In *Favre v. Austin*, 361 So.2d 109 (Ala. 1978), the Supreme Court discussed the theory of resulting trust in which a party who actually pays for property may be recognized as the owner—though legal title is recorded in another. One of the elements to be proved is that the party paying did not intend a beneficial interest or gift to the owner of record, the case said. The court refused to impose a resulting trust because the paying plaintiff had not proved that no beneficial interest was intended. *See also Hooks v. Hooks*, 264 Ala. 66, 84 So.2d 354 (1955) and *Shirley v. McNeal*, 274 Ala. 82, 145 So.2d 415 (Ala.1962) (resulting trust declared in property when plaintiff showed he had made downpayment, payments). The record in the Thomas case seems clear on the point that Ms. Thomas did not intend to give up her interest in the house, that she did make the payments that were made in recent years.

There are also cases on record in Alabama's body of common law on property interests which invoke the doctrine of equitable estoppel to bar enforcement of some title rights. Central Bank of the South's acceptance of Ms. Thomas payments might thus be viewed as inviting these defenses if the financial institution attempted to enforce its claims against Ms. Thomas' equitable interest in state court. *See Braswell Wood Co., Inc. v. Fussell*, 474 So.2d 67 (Ala.1985). For the Bank accepted the payments that Ms. Thomas provided without either questioning her right to the property or her obligation on the indebtedness.

In *Grass v. Ward*, 451 So.2d 803 (Ala. 1984) the Supreme Court recognized that equitable conversion—vesting a widow with equitable title—had taken place at the point where she paid off a mortgage that had been in her former husband's name. He had permitted her to live in the house so long as she paid the mortgage and had agreed that when she made the final payment, he would execute a quitclaim deed conveying the property. He did not execute the deed—but on the ex-wife's death the Alabama Supreme Court vested her estate with equitable title regardless.

And in *Ken Realty Co. v. State*, 247 Ala. 610, 25 So.2d 675 (1946), the Alabama Su-

preme Court found that the "beneficial owner" rather than the holder of legal title was responsible for taxes on real estate interests. In that case, a corporation, purchasing land from the United States government under a conditional sale contract which gave it possessory and leasing rights, sale rights and the risk of damage or loss, would pay taxes to the State of Alabama as "owner" of the land.

Thus state law contains a variety of vehicles whereby an interest can be recognized which is less than or different from the merged legal and equitable title of unmortgaged real property. Ownership interests can come in many guises under Alabama law.

3. Ms. Thomas has rights in The Glen property which must be recognized by the Court.

Central Bank of the South has failed to prove that Ms. Thomas signed away her equity of redemption on the house in The Glen. Consequently, the equity of redemption which Alabama common law grants mortgagors is presumed still intact. Additionally, her payments made to and accepted by the Bank in recent years, and her unbroken occupation of the dwelling for the last several years, bolster her case for a property right in the house.

## II.

THERE IS NOTHING IN THE PLAIN LANGUAGE OF OR CONGRESSIONAL INTENT BEHIND SECTION 1322 TO BAR A CURE OF POST–PETITION ARREARAGE.

A. NEITHER THE LANGUAGE OF THE CODE NOR ITS LEGISLATIVE HISTORY SHOW ANY CONGRESSIONAL INTENT THAT DEBTORS BE PROHIBITED FROM CURING POST–PETITION DEFAULT.

1. The plain language of the Code says "any default."

11 U.S.C. § 1322 provides requirements for a Debtor's plan for reorganization under Chapter 13. The subsections most pertinent to this discussion include the Section 1322(b)(2), (3) and (5):

(b) Subject to subsections (a) and (c) of this section, the plan may—

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims;

(3) provide for the curing and waiving of *any default;*

(5) notwithstanding paragraph (2) of this subsection, provide for the curing of <u>any default</u> within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due. (underlining for emphasis)

Then 11 U.S.C. § 1329(a)(1) and (2) provides the statutory basis for modifying the plan in conformity with the requirements of Section 1322. It provides:

(a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to—

(1) increase or <u>reduce</u> the amount of payments on claims of a particular class provided for by the plan;

(2) <u>extend</u> or reduce the time for such payments.... (underlining for emphasis)

2. The legislative history gives no indication that Congress intended to allow debtors to cure only prepetition default.

According to the legislative history of Section 1322, it is intended that a claim secured by the debtor's principal residence be handled under Section 1322(b)(5). Thus Congressional Record statements on the Bankruptcy Reform Act of 1978 include the following:

Section 1322(b)(2) of the House amendment represents a compromise agreement between similar provisions in the House bill and Senate amendment. Under the House amendment, the plan may modify the rights of holders of secured claims other than a claim secured by a security interest in real property that is the debtor's principal residence. It is intended that a claim secured by the debtor's principal residence may be treated with under Section 1322(b)(5) of the House amendment. (underlining for emphasis)

(124 Cong.Rec. H11106–07 (daily ed. Sept. 28, 1978); S17423 (daily ed. Oct. 6, 1978); remarks of Rep. Edwards and Sen. DeConcini.)

Neither House nor Senate reports make any differentiation between pre- and post-petition default in their comments on Section 1322(b)(3) and (5) (the section for long-term debt.) It seems likely that if Congress had intended a debtor's ability to cure default to be limited to pre-petition default, the legislative reports would have said so. Instead, the plain language of the statute unambiguously says "any default." The following is taken from the House Report on the Bankruptcy Reform Act of 1978:

Subsection (b) lists the provisions the plan is permitted to contain. The plan may designate a class or classes of unsecured claims, other than priority claims, subject to the provisions of section 1122, relating to classification of claims. The plan may modify the rights of holders of secured claims or of holders of unsecured claims. It may provide for the *curing and waiving of any default.* The plan may provide for payments on unsecured claims to be made concurrently with payments on secured claims or priority claims (which are unsecured claims).

Paragraph (5) concerns long-term debt, such as mortgage debt. It permits the plan to provide for the curing any default within a reasonable time, and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due.... (underlining for emphasis)

H.R.Rep. No. 595, 95th Cong., 1st Sess. 429 (1977), U.S.Code Cong. & Admin.News 1978, p. 6384.

The Senate Report likewise defined the functions of the sections in question in such straightforward fashion:

Subsection (b) permits a chapter 13 plan to: (1) (going through the subsections by number) divide unsecured claims not entitled to priority under section 507 into classes in the manner authorized for chapter 11 claims; (2) modify the rights of all holders of secured and unsecured claims, except claims wholly secured by real estate mortgages; (3) cure or waive any default; ... (5) provide for curing any default on any secured or unsecured claim on which the final payment is due after the proposed final payment under the plan; ... (underlining for emphasis)

S.Rep. No. 989, 95th Cong., 2d Sess. 141 (1978), U.S.Code Cong. & Admin.News 1978, p. 5927.

3. The most prestigious treatise on bankruptcy law also interprets the code to allow a cure of post-petition default.

Collier on Bankruptcy's 15th edition, the most respected treatise on bankruptcy law, also espouses the view that a debtor may modify a plan under Section 1329 to cure a post-petition default.[1] "The debtor may wish to modify the plan for any of a number of reasons," Collier says at P. 1329.01. "A debtor may fall behind on

---

1. 5 L. King, Collier on Bankruptcy, P. 1329.01 (15th ed. 1989) provides the following:

**Modification of Plan after Confirmation § 1329.**
**[1]—In General**
 **[a]—Modifications at the Request of the Debtor.**

Chapter 13 debtors often encounter circumstances during the extension period which were unforeseen at the time of confirmation. Further persistent deterioration in a debtor's financial condition after confirmation usually leaves only four courses of action open to the debtor. The debtor may convert the case to chapter 7 apply for a hardship discharge un-

post-petition mortgage payments and then seek to modify the plan to provide for a cure of the post-petition default." (underlining for emphasis)

This Court espouses the view that Section 1322(b)(5) is not limited to pre-petition defaults since the plain language of the statute provides for the curing of "any defaults." Additionally, a post-confirmation curing under Section 1322(b)(5) does not necessarily comprise a forbidden modification of a secured creditor's rights (under Section 1322(b)(2)). Indeed, Central Bank could be viewed as being in sounder shape in its rights against Ms. Thomas than it was prior to its unsuccessful Motion for Relief from Stay.

## B. THERE IS DIVISION ON THE ISSUE OF ALLOWING DEBTORS TO CURE POST–PETITION DEFAULT.

Despite the seeming clarity of the statutory language, the issue of allowing Chap-

der section 1328(b), dismiss the case, or modify the chapter 13 plan in response to prevailing conditions. A debtor is not eligible for discharge relief under section 1328(b) in circumstances when a post-confirmation modification of the plan is practicable. (underlining for emphasis)

**2.** As *In re Ford,* 84 B.R. 40 (Bkrtcy.E.D.Pa.1988) put it:

At the outset, we reiterate our statement in *In re Small,* 65 B.R. 686, 689 (Bankr.E.D.Pa. 1986), *aff'd,* 76 B.R. 390 (E.D.Pa.1987), that the interplay of §§ 1322(b)(2) and (b)(5) is less than clear. However, we also reiterate our one definitive statement therein regarding their interplay: "there is a significant difference between the 'curing of any default,' which is the subject matter of § 1322(b)(5), and 'modification of the rights of holders of secured claims,' which is the subject matter of § 1322(b)(2)." . . .
*Ford* at 43.
The Fifth Circuit Court of Appeals has also noted this interplay:
Based on the foregoing, we conclude that Congress did not view a cure of a home mortgage as a modification of the holder's rights within the meaning of § 1322(b)(2) and, accordingly, that neither the power to cure under § 1322(b)(3) nor the power to cure under § 1322(b)(5) is limited by the provision of § 1322(b)(2) prohibiting modification of home mortgages.... Based on text legislative history, we believe that § 1322(b)(5) was intended to make it clear that the power to cure extends to long-term obligations that will

ter 13 debtors to cure post-petition default is a source for disagreement. Perhaps this confusion stems from the intricacy of interplay of Bankruptcy Code sections [2] as well as a basic discomfort in some judicial quarters with the main policy thrust of the Bankruptcy Code. However, the majority rule among the bankruptcy courts of the nation appears to be that a post-petition default may be cured in a Chapter 13 plan when circumstances are appropriate.[3]

The policy goal set by Congress in the reorganization chapters is providing the debtor with his/her best chance at a fresh start while equitably sharing the debtor's resources with creditors according to a plan. At times, these basic Congressional goals thwart creditors in exercise of rights they would have available to them under state law. This Court views its role as implementing the policy goals of Congress.

Thus there are differing views on this issue found in the case law. The Court of

survive beyond the life of the plan. When § 1322(b)(5) is so viewed, the function of § 1322(b)(3) is to provide authority for curing obligations that will be paid off during the life of the plan.
*Grubbs v. Houston First American Savings Ass'n,* 730 F.2d 236, 243–5 (5th Cir.1984) (en banc).

**3.** As the 1988 *Ford* case, n. 2 *supra,* put it:
This controversy also presents the specific issue of a debtor's right to cure post-petition defaults in a Chapter 13 plan. This issue has surfaced in a number of cases. The majority rule appears to be consistent with Collier's statement that, even in a situation where § 1322(b)(5) is applicable, "[i]t [§ 1322(b)(5)] may be utilized to cure post-petition defaults." 5 COLLIER ON BANKRUPTCY, 1322.09, at 1322–18 (15th ed. 1987). *See, e.g. In re McCollum,* 76 B.R. 797, 799–801 (Bankr.Ore.1987); *In re Nickleberry,* 76 B.R. 413, 416 (Bankr.E.D. Pa.1987); *In re Minick,* 63 B.R. 440, 442–46 (Bankr.D.D.C.1986); *In re Canipe,* 20 B.R. 81, 83–84 (Bankr.W.D.N.C.1982); and *In re Simpkins,* 16 B.R. 956, 960–68 (Bankr.E.D.Tenn. 1982). These cases involve § 1322(b)(5), and hold that a post-petition default of even a long-term obligation can be cured in a Plan despite the protections for long-term lenders provided in § 1322(b)(5), and the mandate of that Code section that the debtor "provide for.... maintenance of payments while the case is pending" on an obligation for which the last payment is due after the last plan payment ...
*Ford* at 44.

Appeals for the Eleventh Circuit has not yet resolved the question for this jurisdiction with a thorough appellate review.

1. The better view is that post-petition default may be cured in cases where circumstances make such relief appropriate.

The Bankruptcy Court for the Western District of Tennessee issued one of the most recent rulings on this issue with a February 1, 1990 decision that, in the proper case, a debtor may modify a plan to cure post-petition default. *In re Gadlen*, 110 B.R. 341 (Bkrtcy.W.D.Tenn.1990) involved Chapter 13 debtors who fell three months behind in payments on the first mortgage on their home. Those payments were being made directly to Leader Federal Savings and Loan which asked for dismissal of the Chapter 13 case and objected to being added to the debtors' Chapter 13 plan.

The Tennessee court said of the savings and loan's contentions:

Section 1322(b)(5) does permit, as an exception to § 1322(b)(2) that defaults may be cured "within a reasonable time." Leader Federal argues that this Code provision is limited to pre-petition arrearages. However, the Code is not so limited in its language. *In re Walter Davis and Jimmye Davis*, *supra* at p. 836. Also, § 1322(b)(3) permits the curing of *any* default. That code provision has been interpreted to permit the curing within the life of the plan. *In re Ford*, 84 B.R. 40, 43–44 (Bankr.E.D.Pa.1988). The *Ford* Court recognized that some courts had placed certain limits on the debtor's ability to cure post-petition defaults either under § 1322(b)(3) or (5). For example: (1) A debt already matured prior to filing *may* not be cured. *See, e.g., In re Seidel*, 752 F.2d 1382 (9th Cir.1985). (2) Suspension of all payments in the plan in order to permit a curing has been frowned upon. *See, e.g., In re Gavia*, 24 B.R. 573 (Brtcy.App.9th Cir. 1982). (3) An unreasonable period of time to cure post-petition arrearages would offend § 1322(b)(5) as would excessive delays in making consistent payments. *See, e.g., In re Parker*, 46 B.R.

106 (Bkrtcy.N.D.Ga.1985). (4) At least one court has held that confirmation, by virtue of § 1327, revested the property in the debtor, created a new mortgage obligation and precluded the automatic stay from having any effect on post-petition arrearages. *See, In re Nicholson*, 70 B.R. 398 (Brtcy.D.Col.1987). (Both the *Ford* Court and this Court disagree with the *Nicholson* rationale.)

*Gadlen* at 344–45.

The Bankruptcy Court for the Western District of Tennessee had also dealt with the issue earlier in *In re Davis*, 110 B.R. 834 (Bkrtcy.W.D.Tenn.1989) and *In re Lynch*, 109 B.R. 792 (Bkrtcy.W.D.Tenn. 1989)—both involving home mortgages. In *Lynch*, the Court found that a Chapter 13 debtor could cure post-petition default via a Section 1329 modification of his plan—but that the formalities of the section such as notice and the requirement of a change of circumstances must be strictly observed. In *Davis*, the Tennessee court found that the post-confirmation cure of Chapter 13 debtors' default was not an impermissible modification (under Section 1322(b)(2)) of a creditor's rights in an indebtedness secured only by the debtors' residence. Rather, the court found it to be permissible cure of post-confirmation default under Section 1322(b)(5). That case reasoned:

As the legislative history underlying Chapter 13 makes clear, if problems such as family illness, medical bills and layoff make execution of a confirmed plan impracticable, the Bankruptcy Code even permits a temporary *moratorium* of payments. H.Rep. No. 595, 95th Cong., 2d Sess. 125, reprinted in 1978 U.S.Code Cong. & Adm.News, 5787, 5963, 6086. Here, Mr. and Mrs. Davis do not seek a moratorium of payments or modifications of the terms of the subject deed of trust. They merely and only seek to amend their confirmed chapter 13 plan to allow for an opportunity to cure a post-confirmation economic default while maintaining ongoing contractual payments and fully recognizing the contractual rate of interest, maturity date, etc.

*Davis* at 835.

The Bankruptcy Court for the District of Oregon has also held in a frequently cited

case, that a debtor could cure post-confirmation default on payments on debt for the principal residence, that such was not a violation of Section 1322(b)(2). The court in *In re McCollum,* 76 B.R. 797 (Bkrtcy.D.Or. 1987) discussed the policy reasons that Congress enacted the "individual with regular income" plan of Chapter 13 in this context:

> The starting point for the analysis is the goal of chapter 13 to rehabilitate the debtor while protecting the creditor's interests. To further that goal, § 1329 provides for modification of a plan after confirmation to take into account changed circumstances. *See* 11 U.S.C. 1329(a). The determination of whether the proposed modification should be approved is based upon the circumstances existing at the time of the proposed modification. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 431 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

*McCollum* at 800.

Such reasoning must apply in Ms. Thomas' case. The record here traces the downward economic spiral of a family which might have had its roots in the drug problem of the primary breadwinner. This resulted in a single-parent home where the only source of income for an adult and two children was and is Social Security disability. These are the types of real world changes of circumstance where Congress envisioned the Bankruptcy Court's discretion allowing cure of a post-petition default on the family home.

> 2. Some courts, however, have held the debtor may not modify the plan to cure post-petition arrearages.

The United States District Court for the Northern District of Alabama, in fact, held in *In re Hollis,* 105 B.R. 1003 (D.N.D.Ala. 1989) that a Chapter 13 debtor was not entitled to cure post-confirmation defaults on his residence. That decision vacated a holding of this Court denying Southeast Bank relief from stay and directing post-confirmation arrearage payments.

As the cornerstone of its holding, the *Hollis* court cited with approval a Colorado decision which barred the cure of a post-petition arrearage under Section 1322(b)(3) (which says simply the plan may provide for "the curing or waiving of *any default*" as noted above). The Alabama district court made *In re Nicholson,* 70 B.R. 398 (Bkrtcy.D.Colo.1987) a basis for its ruling:

> The bankruptcy court in *In re Nicholson* decided simply that where Congress in § 1322(b)(3) allows "the curing or waiving of any default" it was referring to defaults that occur *pre-petition* and not defaults which occur *post-plan.* The bankruptcy court in *Nicholson* logically concluded that the debtor was not entitled to cure his post-confirmation defaults. This court agrees with the *Nicholson* court. The Bankruptcy Act in this situation contains an absolute principle which leaves no room for a routine or predictable exercise of discretion that invites and even encourages post-confirmation debtor default in Chapter 13 cases.

*Hollis* at 1006.

The legislative history of 11 U.S.C. § 1322 does not support the *Nicholson* view of Section 1322(b)(3)—and the legislative history of Section 1322 does envision that it is Section 1325(b)(*5*) which should be applied to long-term debt such as a home mortgage.

Additionally, as noted in the *Gadlen* case in Tennessee, *Nicholson's* holding was rooted in the theory that confirmation, by virtue of Section 1327, revested the property in the debtor, created a new mortgage obligation, and precluded the automatic stay from having any effect on post-petition arrearages. This court, like the *Gadlen* court, cannot agree with this minority interpretation of Chapter 13's protections of the individual's fresh start.

The *Hollis* view, carried to its logical conclusion, would have the absurd result that a Chapter 13 plan could cure thousands of dollars in pre-petition default—but could not cure even $1.00 in post-petition default. It would have the effect of reading the Section 1329 "Modification of Plan after Confirmation" out of the Bankruptcy

Code.[4] In effect, an adoption of the *Hollis* view would require a reading of Section 1329 that guts the statute—to bar what the plain language says, that plans may be modified to reduce amount and extend time of debtors' payments.

Again, in the real world, debtors get sick, change jobs, get married, have babies, have automobile accidents, and suffer many other happenstances. It seems clear that Congress intended that these changes in circumstances be taken into account with plan modifications.

At any rate, *Hollis* was based on a fact pattern very different than Ms. Thomas' circumstance. In *Hollis,* the debtor went into Chapter 13 with pre-petition arrearage in his plan, in addition to monthly payments. He defaulted subsequent to the petition and then failed to answer or appear when a hearing was set in the case. Here, Ms. Thomas made her last payment to the Bank, though indeed it was late and was applied to April, the very month the bank's motion was filed. Since that month, July of 1990, the Bank's regular monthly payment was added to her plan—to be deducted from the payment from her Social Security check going to the Chapter 13 Trustee's office.

In the neighboring state of Georgia, a bankruptcy court in *In re Cotton,* 102 B.R. 891 (Bkrtcy.D.Ga.1989) looked at the issue entirely from the standpoint of 11 U.S.C. § 1329(a) taken in isolation, finding that since this section did not mention arrearage, no cure for default could be granted on a mortgage entered *post-confirmation.* The *Hollis* court cited this case with approval. However, its fact pattern, and consequently, the court's conclusion, is inapposite to the issue of curing post-petition default on *residential mortgages* entered *prior* to confirmation.

The *Cotton* case must be totally distinguished from Ms. Thomas' because the debtor in *Cotton* assumed the mortgage in question more than two years *after he filed bankruptcy.* Ms. Thomas and Ray A. Richards executed the mortgage with Central Bank of the South prior to either of their Chapter 13 petitions.

Two other cases cited in connection with this issue are too factually remote to helpful in this discussion. However, *In re McKissie,* 103 B.R. 189 (Bkrtcy.N.D.Ill. 1989) dealt primarily with the issue of good faith in serial filings of bankruptcy. In *In re Sensabaugh,* 88 B.R. 95 (Bkrtcy.E.D.Va. 1988) a Chapter 11 debtor's post-confirmation mortgage default was found to constitute a material breach warranting dismissal of the case under 11 U.S.C. § 1307(c)(6).

3. Use of the Court's discretionary power to allow Ms. Thomas to correct post-petition arrearage is the appropriate thing to do in this case.

 It is this Court's position that, when circumstances are appropriate, bankruptcy courts may use their 11 U.S.C. § 105(a) powers to allow debtors to modify Chapter 13 plans via 11 U.S.C. § 1329(a)(1) and (2) to cure post-petition mortgage defaults under 11 U.S.C. § 1322(b)(5).

### III.

### THE BANK'S MOTION FOR RELIEF FROM STAY WAS DUE TO BE DENIED UNDER SECTION 362(d)

 There are two bases in the Code on which a party may request relief from the automatic stay that protects the debtor from most court process or enforcement of security interests. A creditor, such as Central Bank of the South, must convince the Bankruptcy Court: 1) that it should be allowed to foreclose its interest for cause— including lack of adequate protection of its collateral interest; or 2) that the debtor has no equity in the property sought to be

---

**4.** 11 U.S.C. § 1329(a)(1) and (2) provides as follows:

(a) At any time after confirmation of the plan but before the completion of payments under the plan, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to—

(1) increase or <u>reduce</u> the amount of payments on claims of a particular class provided for by the plan;

(2) <u>extend</u> or reduce the time for such payments ...

(underlining for emphasis)

foreclosed *and* the property is not necessary to the debtor's reorganization.

Central Bank of the South may not obtain relief from stay under either base and thus its Motion for Relief from Stay on the house in The Glen is due to be denied.

## A. CENTRAL BANK OF THE SOUTH HAS ADEQUATE PROTECTION IN ITS EQUITY CUSHION IN THE HOME IN THE GLEN AS WELL AS THE PAYMENT SCHEDULE ORDERED BY THE COURT.

■ 11 U.S.C. § 362(d)(1) reads as follows:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; ...

The most current testimony on the exact financial status of the Bank in relation to the mortgage on The Glen property came at the August 14, 1990 hearing in which Ms. Harrell testified that the Bank's payoff at that point was $15,440.02. She said that the property was appraised at $22,400.00 if sold at distress sale; at a fair market value of $32,000.00, otherwise. The arrearage figure named in September was $1,086.35.

Consequently, even if this property were sold at distress sale, the Bank would still have an "equity cushion" of $6,959.98 beyond the balance due—more than six times the then-existing arrearage. If the property were sold for fair market value, that equity cushion would be $16,559.98—more than 100 percent over the total debt still owed by Ms. Thomas and Mr. Richards.

Additionally, the Court in July of 1990 granted Central Bank of the South a fixed payment of $217.27 per month on current mortgage payments (long-term debt under 11 U.S.C. § 1322(b)(5)). Then on September 12, 1990, the Court entered an order granting the Bank a further fixed payment of $35.00 per month on the five months of mortgage arrearage totalling $1,086.35. (As pointed out, those payments are to be routed to the bank via the Chapter 13 trustee's office on deduction from Ms. Thomas' Social Security disability payment.)

The factors cited above constitute adequate protection for this Creditor's interest. Therefore, the Court may not grant Central Bank of the South relief from stay under 11 U.S.C. § 362(d)(1).

## B. RELIEF FROM STAY COULD NOT COME UNDER SECTION 362(d)(2) SINCE THE DEBTOR HAS EQUITY IN THE PROPERTY AND IT IS NEEDED FOR HER REORGANIZATION.

■ 11 U.S.C. § 362(d)(2) reads as follows:

> (d) On request of a party in interest, and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> (A) the debtor does not have an equity in such property; and
> (B) such property is not necessary to an effective reorganization.

As discussed above, the Bank failed to prove conclusively that Ms. Thomas signed the quitclaim deed which bore her purported signature. And setting aside the issue of recorded title, it seems clear that under Alabama law, Ms. Thomas would be judged to have at least an equitable interest in the home in The Glen by virtue of her possession of the house for a period of years and her years of payments, accepted by the Bank as late as the month it filed this motion. Therefore, she does have equity in the house and the Bank cannot satisfy Section 362(d)(2)(A).

Likewise, a stable residence, particularly one in which the debtor and her two children have lived for a number of years, must be considered essential to a successful reorganization under Chapter 13. Therefore, the Debtor has met her burden of showing that the collateral is necessary to reorganization. The Bank cannot satisfy Section 362(d)(2)(B).

Consequently, the Court cannot grant Central Bank of the South relief from the automatic stay under 11 U.S.C. § 362(d)(2) since neither of the elements required for relief from stay have been proven in this case.

## C. SINCE NEITHER CODE SUBSECTION HAS BEEN SATISFIED, THE BANK'S MOTION FOR RELIEF FROM STAY MUST BE DENIED.

Determining whether a creditor has "cause" or a "lack of adequate protection" (Section 362(d)(1)); determining whether a debtor has equity in the collateral and whether the collateral is necessary to the debtor's successful reorganization (Section 362(d)(2)) involve questions of fact and law. Therefore, the Court must deny the Bank's motion after weighing the factual evidence in this case in the context of the applicable law.

### CONCLUSION

As bankruptcy courts exercise their statutory imperative to implement Congressional policy, they must take into account all of the circumstances adduced by testamentary and documentary evidence, framed by the applicable law. Evaluating the credibility of the sometimes conflicting testimony in this case has made that task difficult.

Yet the totality of the circumstances—from both the Debtor's and the Creditor's point of view—dictates that Central Bank of the South's Motion for Relief from Stay must be denied. Additionally, Ms. Thomas must be given the opportunity to cure the post-petition arrearage reported in this case so that she may have her best chance at reorganizing her personal finances.

This memorandum shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. Separate orders have been entered consistent with this opinion.

DONE AND ORDERED.