**In re Raymond Jay STEELE and Judith Ann Steele, Debtors.**

**Bankruptcy No. BK–94–15673–LN.**

United States Bankruptcy Court, W.D. Oklahoma.

May 12, 1995.

Kenneth C. McCoy, Oklahoma City, OK, for debtors.

Don J. Timberlake, Oklahoma City, OK, for Liberty Mortg. Co.

## *ORDER ON MOTION FOR RELIEF FROM AUTOMATIC STAY, FOR ABANDONMENT OF PROPERTY, OR ALTERNATIVELY SEEKING ADEQUATE PROTECTION*

PAUL B. LINDSEY, Chief Judge.

### BACKGROUND

Debtors commenced this case on October 11, 1994, by filing their voluntary petition under Chapter 13 of the Bankruptcy Code.[1] In their original Chapter 13 plan, filed with their petition, debtors proposed to make 36 monthly plan payments of $700, and to make monthly payments of $370 to Liberty Mortgage Company ("Liberty") on their home mortgage outside the plan, rather than through the Chapter 13 Trustee ("Trustee"). The plan reflected no pre-petition arrearages to be cured pursuant to § 1322(b)(5).[2]

On November 1, 1994, Liberty filed its Objection to Amended Chapter 13 Plan of Debtors.[3] In the objection, Liberty set out the amount required for payoff of the mortgage loan, as shown in its proof of claim. Liberty also asserted that, while the plan reflected no pre-petition arrearage, such an arrearage did in fact exist, in the amount of approximately $1,000, and that the same was shown in Liberty's proof of claim.

Subsequently, on November 16, 1994, debtors filed their first amended Chapter 13 plan. In it, as in the original plan, debtors proposed to make 36 payments of $700 per month. The amended plan stated that the first plan payment would be made in December 1994. Debtors proposed to pay the ongoing mortgage payments of $370 per month through the Trustee, rather than outside the plan, as originally proposed, and to cure arrearages *through November 1994*, said to be in the approximate amount of $990, with interest at 8% per annum, by monthly payments of $54.09 while administrative claims were being paid, and $93.52 thereafter until paid in full.

Debtors' first amended plan was unusual, to say the least, in several particulars. In Chapter 13, if a plan is not filed with the petition, one must be filed within 15 days thereafter.[4] Debtors are required to commence making plan payments within 30 days after their plan is filed, unless the court orders otherwise.[5]

Debtors' plan was filed with their petition, on October 11, 1994. Their plan payments to the Trustee, therefore, should have commenced no later than November 10, 1994. Debtors did not seek the entry of an order permitting a delayed commencement of plan payments. Absent such a preconfirmation order, only a confirmed plan which called for the first plan payment to be made in Decem-

---

1. References herein to statutory provisions by section number only will be to provisions of the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., unless the context requires otherwise.

2. Section 1322(b)(5), in material part, permits a plan to provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any secured claim on which the last payment is due after the date on which the final payment under the plan is due.

3. In fact, no amended plan had been filed at that time, and it is assumed that reference to an amended plan in the caption of the objection was in error.

4. Rule 3015(b), Fed.R.Bankr.P.

5. Section 1326(a)(1).

ber 1994 could support an exception to the rule prescribed by the statute. No objection to the proposed deferral of the first plan payment was interposed, by Liberty or any other party in interest, and it ultimately became a part of debtors' confirmed plan.

Debtors' first amended plan contained no explanation of how the ongoing $370 monthly mortgage payments could be made through the Trustee, rather than outside the plan, since the total number of plan payments, 36, and amount of each payment, $700, were unchanged.

The amount of arrearages proposed to be paid under the first amended plan is approximately the same as the amount set out in Liberty's proof of claim. The first amended plan, however, specifies that the arrearages to be paid are those incurred "thru November 1994." The arrearages contained in Liberty's proof of claim were accrued prepetition. Under the terms of the mortgage, payments were due on the first of the month and became delinquent on the 10th.

Liberty, in its proof of claim, includes interest accrued from August 1 to October 11, 1994. This indicates that the two missed payments included in its arrearage claim were the September and October 1994 payments. In debtors' first amended plan, however, the first post-petition payment, that which became due in November 1994, was included in the amount of arrearages proposed to be cured through the plan. Thus, debtors' first amended plan proposed to include one missed post-petition payment in the arrearage to be cured. Liberty's arrearage proof of claim included only payments which had been missed prepetition. The plan contains no explanation of how, in the circumstances, the amount proposed to be paid during the term of the plan to cure the arrearage could remain approximately the same as the amount claimed by Liberty.[6]

As is discussed above, debtors proposed in their first amended plan to combine arrearages arising out of prepetition and post-petition defaults into a single unit, and to cure them in their entirety under § 1322(b)(5). Until recently, this court knew of no authority specifically permitting the cure of post-petition defaults under § 1322(b)(5).[7]

On November 23, 1994, the Trustee filed her objection to confirmation of debtors' first amended plan, asserting that the plan was not feasible and that the attorney fees provided for exceeded a reasonable amount,[8] and the Oklahoma Tax Commission ("OTC") filed its objection to confirmation, based upon debtors' failure to file certain income tax returns and to provide for payment in full for certain priority tax liabilities.[9]

Also on November 23, 1994, debtors filed their second amended plan. The treatment of the Liberty claims, including the arrearage, remained as in the first amended plan, but the discrepancy in the plan payment amount was resolved by providing for an increase in the amount of the 36 monthly plan payments to $1,070. The proposal to commence plan payments in December 1994 remained unchanged.

On December 5, 1994, the Trustee objected to confirmation of the second amended plan, alleging unreasonable attorney fees and debtors' failure to account for all funds being paid into the plan.

On December 19, 1994, a hearing was held on confirmation of the debtors' second amended plan. Debtors, OTC and the Trustee appeared by counsel, OTC and the Trustee withdrew their objections to confirmation and the plan was conditionally confirmed, reserving the issue of the reasonableness of counsel's attorney fees and expenses. There was no appearance on behalf of Liberty at the confirmation hearing.

Pursuant to an application, appropriate notice and a hearing held December 20, 1994,

---

**6.** The court will grant to Liberty the right to file an amended arrearage claim to include the November payment.

**7.** *See Green Tree Acceptance, Inc. v. Hoggle (In re Hoggle),* 12 F.3d 1008 (11th Cir.1994), and discussion, *infra.*

**8.** *See* Sections 1325(a)(6), 503(b)(2) and 330(a)(1).

**9.** *See* Section 1322(a)(2).

the court entered an order awarding compensation and expenses to counsel for debtors in the total amount of $1,515.78.

An order confirming debtors' Chapter 13 plan was signed by the court on January 6, 1995 and filed January 12, 1995. This order provided for 36 monthly plan payments of $1,070, a "base amount" of $38,520. Attorney fees awarded to debtor's counsel were to be paid $593 out of the first plan payment and $250 out of each succeeding payment until paid in full. Liberty's first mortgage claim, shown as "fully secured," was to be paid at $363 per month, the amount required pursuant to the mortgage note. Liberty's arrearage claim, also shown as "fully secured," was to be paid, with interest at 8% per annum, at $93.52 per month.[10]

### THE CURRENT MOTION

On February 28, 1995, Liberty filed its Motion for Relief from Automatic Stay and Abandonment of Property, or Alternatively Seeking Adequate Protection, with supporting brief. Liberty asserts that there have been post-petition defaults in debtors' mortgage obligation, that the $363 monthly payments for November and December 1994, and January and February 1995, a total of $1,452, have not been made, that attorney fees and bankruptcy court costs of $310 have been incurred, and that the only payment received by Liberty has been $198.64 received from the Trustee on February 1, 1995.

In response, debtors simply assert that there is equity in the property, that it is debtors' principal residence, that it is necessary for their effective reorganization, and that debtors have made all plan payments required of them.

It appears clear that under their second amended plan, debtors did not propose to make a plan payment in the month of November 1994, and that therefore no payments would be made to creditors by the Trustee for that month.[11] Similarly, that plan plainly provided that administrative expenses, consisting of the attorney fees and expenses awarded to counsel, estimated at $1,500, would be paid $593 from the first plan payment and $250 from each subsequent payment until the entire amount was paid in full. Those fees and expenses would therefore be paid out of the first five monthly plan payments.

As is discussed above, the second amended plan also provided that Liberty's arrearage claim would be paid at $54.09 per month "while administrative fees are being paid" and $93.52 per month thereafter until paid in full. Except for the reference to the reduced payment on Liberty's arrearage claim, the plan contained no reference to or explanation of how other claims would be paid in the early months of the plan, when a significant portion of the total plan payments would be diverted to pay administrative expenses.

Neither did the plan contain any indication that debtors wished to prefer or favor Liberty over the holders of other secured claims, or any direction to or authority for the Trustee to do so. In the absence of any such indication or direction, the Trustee had no authority to take any action beyond simply withholding the appropriate Trustee fee, making the prescribed payments to the administrative claim of counsel for debtors, making the prescribed payment on Liberty's arrearage claim, and distributing whatever remained of each plan payment to the holders of secured claims, pro rata.[12] Necessarily in these circumstances, each such holder would receive less than a full payment out of each of the first five plan payments.

At the hearing on Liberty's motion, the following statement was made by counsel for Liberty:

---

10. As is noted above, both the first and second amended plans provide that the arrearage claim would be paid at $54.09 per month "while administrative fees are being paid," then at $93.52 per month until paid in full.

11. It is the practice of the Trustee to make distributions to creditors pursuant to confirmed plans only on the first business day of each month. Thus, a plan payment made to the Trustee at any time during one month will ordinarily not be distributed until the following month.

12. The record does not reflect whether payments on the arrearage claim in the early months of the plan were made in the reduced amount provided for in the second amended plan or in the greater amount provided for in the order confirming the plan.

Our position, I reiterate one more time, is that—first of all, this is an unusual district. No other districts allow this type of a, in our opinion, impermissible modification of the terms of the note and mortgage; that is, that the payments on a post-petition basis are due on the 1st of the month, delinquent on the 10th. The Code means what it says, that you have to make the ongoing payments on a timely basis.

## DISCUSSION

■ This court, to which all Chapter 13 cases in this judicial district are now assigned, has previously faced and addressed the issues raised by Liberty, in *In re Rogers,* No. BK–92–13424–LN, 1993 WL 773862, Order dated April 14, 1993 (Bankr.W.D.Okla.). The issues raised in that case are virtually identical to those raised here. In this court's view, the solutions suggested are entirely appropriate to the circumstances here presented. Since *Rogers* was not published, its holding and *dictum* are not familiar to many members of the bar of this court. It is therefore appropriate that the court quote extensively from *Rogers* in this order.

In *Rogers,* the holder of debtors' home mortgage moved to dismiss debtors' bankruptcy case after confirmation of debtors' plan, claiming that debtors had failed to make the required payments under the plan. In fact, all plan payments had been made, but debtors had not made the mortgage payment which became due after the filing of the petition but before the first plan payment was required to be made. It is not clear whether, as here, payments to the creditor had been reduced due to payment of administrative expenses in the early months of the plan. In any event, the movant alleged that he had been "shorted" by an amount equal to approximately one and one-half monthly payments over an eight month period.

In *Rogers,* this court first determined that in the circumstances present in that case, movant was bound, under principles of *res judicata,* by the provisions of the confirmed plan, and that therefore the motion to dismiss could not be granted.[13] It also determined, however, that while certain of the contentions of movant were without support in the law, other contentions, with regard to the effect of post-petition defaults, had merit. It was therefore concluded that a thorough discussion of the issues raised, and of possible solutions which could be employed in future cases, was warranted.

This court's discussion in *Rogers,* in material part, was as follows:

> It should first be noted that while [Creditor] contends that Debtors have violated § 1322(b)(2) by modifying [Creditor's] rights, Debtors' plan proposes to cure arrearages and maintain regular post-petition payments under § 1322(b)(5), which by its own terms may be employed "notwithstanding paragraph (2) of this subsection." Thus, Debtors' plan, if it complies with § 1322(b)(5), does not violate § 1322(b)(2). [Footnote omitted.]
>
> The crux of [Creditor's] argument is that the first post-petition payment was not made and that it will be made up by the Trustee, but over the entire term of the Chapter 13 plan—in this case, 57 months. Thus, [Creditor] apparently contends that regular post-petition payments are not being maintained and that therefore § 1322(b)(5) is not complied with. Debtors' counsel, at the hearing and in his brief, conceded that the first post-petition mortgage payment is frequently not made, and that the Trustee is relied upon to make up the amount of the payment over the term of the plan from funds earmarked for other purposes. He asserted, however, that this failure is the fault of the Congress and not of Debtors, and stated that the ability to skip the first post-petition payment is sim-

**13.** Section 1327(a) is as follows: "(a) The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." Upon becoming final, the order confirming a chapter 13 plan represents a binding determination of the rights

and liabilities of the parties as ordained by the plan. Absent timely appeal, the confirmed plan is *res judicata* and its terms are not subject to collateral attack. *See* 5 *Collier on Bankruptcy,* ¶ 1327.01[1], 1327–2 (15th Ed.1995). *See In re Szostek,* 886 F.2d 1405 (3rd Cir.1989); *Commonwealth of Pennsylvania v. Flick (In re Flick),* 5 C.B.C.2d 494, 14 B.R. 912 (Bankr.E.D.Pa.1981).

ply another benefit that the Bankruptcy Code confers upon Chapter 13 debtors. This court does not agree.

The fact that the Code does not require the first plan payment to be made to the Trustee until 30 days after the filing of the plan does not relieve Debtors of their ongoing contractual obligation to [Creditor] during that period. Counsel for Debtors would treat that period as though it did not exist, and would depend upon the Trustee to "cure" any arrearage which arose during that time. This court knows of no authority in the Code which specifically addresses post-petition arrearages. Similarly, no provision in Debtors' plan appears to address the issue. Counsel simply assumes that the Trustee will automatically take on responsibility for "curing" Debtors' failure to make the first post-petition payment required by their note and mortgage instruments, and that she will somehow find the funds within subsequent plan payments with which to effect this "cure."

Apparently, the Trustee also assumes that she is responsible for this "cure," and in the past, without any specific authority or direction, over the life of the plan, she has simply done so, from whatever funds could be found for that purpose. The result has been that secured creditors have been required to wait for as long as five years to receive the full amount of a payment which should have been made to them within the first month of bankruptcy.

This practice appears to be inconsistent with, and impermissible under, the provisions of § 1322(b)(5), under which debtors must propose to cure any pre-petition defaults within a reasonable time *while maintaining regular payments* during the pendency of the case, where the last payment would be due after the last payment under the plan.

Counsel for debtors appears to contend that since the Code does not require Debtors to make their first plan payment to the Trustee until 30 days after the filing of a plan, Debtors are somehow either prohibited from or permitted to forego making payments on ongoing obligations which are to be dealt with under the plan. This contention may most charitably be characterized as specious.

If Debtors expect to convince their creditors, the Chapter 13 Trustee, and ultimately this court, that they will be able to make all payments proposed under their plan, i.e., to establish the feasibility of their plan under § 1325(a)(6), they should make contractual payments coming due between the petition date and the date of the first payment to the Trustee under the proposed plan, either directly to the creditor as before bankruptcy, or to the Trustee in anticipation of the provision for future payments under the plan. If, for whatever reason, such payment is not made, the post-petition default should be promptly disclosed and specific provision should be made in the plan for its cure during the early months of the plan.

Post-petition default in regular payments and failure to provide for an early cure under the plan, in cases where Debtors propose to proceed under § 1322(b)(5), may constitute grounds for denial of confirmation to the plan, when a timely objection has been filed and served.

Post-petition default in regular payments will often result in the affected creditor seeking relief from the automatic stay in order to enforce its rights, or alternatively, seeking adequate protection. In such instances, if relief from the stay is denied, the court should require, as adequate protection, *inter alia*, that debtors make payments, in amounts over and above the amount provided for by the plan or by the mortgage documents, until the post-petition arrearage has been cured. As an example, Debtors could be required to make payments equal to one and one-half or two times the contractual mortgage payment until the post-petition arrearage is cured. Such payments should be designed to cure the arrearage within a very few months.

Any argument that debtors can not afford additional payments would be unpersuasive in most cases, since the arrearage will have been created in the first instance by debtors having retained, or expended elsewhere, the funds which should have been

paid either to the creditor or to the Trustee.

In addition, adequate protection for the creditor in such instances should include, at the least, reasonable access to the property for inspection, proof of appropriate insurance coverage, and provision for immediate relief from the automatic stay in the event of any subsequent default, if not cured within 72 hours after telephonic notice thereof.

*Rogers, supra,* pages 4–7.

As in *Rogers,* the creditor in this case, Liberty, must be held to be bound by the provisions of the confirmed plan. While Liberty objected to confirmation of debtors' original plan, that objection consisted solely of asserting the amount owed to it and that debtors had failed to schedule Liberty's arrearage claim.

Liberty has been at all times treated by debtors as fully secured, and the failure of debtors to schedule the arrearage claim was corrected by the listing and treatment of the claim in debtors' first and second amended plans. Liberty filed no objection to the confirmation of either debtors' first or second amended plan and, as is noted above, did not appear at the hearing at which conditional confirmation of debtors' second amended plan was ordered. Liberty did not seek reconsideration of the court's subsequent order confirming debtors' plan, nor did it prosecute an appeal from that action. As a result, it may not now be heard to complain that it has been disadvantaged by actions which were clearly contemplated in the plan which was ultimately confirmed.

In *Nobelman v. American Savings Bank,* — U.S. ——, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993), it was held that § 1322(b)(2) protected from plan modification all of the prepetition state law rights of the holder of a claim secured only by a security interest in the debtor's principal residence, rather than only its rights with respect to its allowed secured claim, as determined under § 506(a).[14] Although counsel for Liberty did not specifically cite *Nobelman* in his above-quoted verbal attack upon this court's administration of this portion of the Bankruptcy Code, it appears that he believes that case's prohibition on modification of the rights of a secured creditor are applicable to the facts of this case. Such is simply not the case.

█ As this court pointed out in *Rogers,* the provision under which debtors' plan in this case treats the claims of Liberty, § 1322(b)(5), operates notwithstanding the provisions of § 1322(b)(2).[15] Thus, a plan which proposes to maintain payments postpetition on debtors' home mortgage, while curing defaults in a reasonable time, as required by § 1322(b)(5), does not propose a modification of the creditor's rights such as is prohibited by *Nobelman.* Counsel for Liberty is simply wrong if he seeks to impress the holding in *Nobelman* upon the operation of § 1322(b)(5). This court is confident that he is equally wrong when he asserts that this court is the only adherent to the position that the application of § 1322(b)(5) is not affected by *Nobelman.* It is difficult to envision statutory language which would be any clearer than "notwithstanding paragraph (2) of this subsection."

If counsel's argument is limited to the "reasonable time" and "maintenance of payments" language of § 1322(b)(5), further discussion is appropriate. This further discussion, however, does not change the conclusion

---

**14.** Section 1322(b)(2) provides that a Chapter 13 plan may: "(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims." Section 506(a) generally provides, insofar as is applicable here, that an allowed claim which is secured by property in which the estate has an interest is a secured claim to the extent of the value of the creditor's interest in the estate's interest in the property, and is an unsecured claim to the extent

that such value is less than the amount of the claim.

**15.** Section 1322(b)(5) provides that a Chapter 13 plan may: "(5) notwithstanding paragraph (2) of this subsection, provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due."

already stated, that Liberty is bound by the terms of the confirmed plan.

In *Green Tree Acceptance, Inc. v. Hoggle (In re Hoggle), supra,* 12 F.3d 1008 (11th Cir.1994), decided more than six months after *Nobelman,* the relatively narrow holding of the court was that the district court had authority to modify a confirmed Chapter 13 plan to allow the debtor to cure, under § 1322(b)(5), a postconfirmation default with reference to a secured claim on the debtor's house.

The opinion in *Hoggle* contains no citation or reference whatever to *Nobelman.* It must be assumed, therefore, that the creditor in that case made no claim of its applicability in the circumstances of that case.

In construing §§ 1322 and 1329,[16] the *Hoggle* court applies the rule of statutory construction which dictates that the plain meaning of a statutory provision is in most instances conclusive.[17] The court also relies upon a leading bankruptcy treatise, in which it is concluded that § 1322(b)(5) "may be utilized to cure postpetition defaults as well as prepetition defaults." [18]

The creditor in *Hoggle* argued that a § 1329 modification could not comply with § 1322, because § 1322 would not permit a provision in an original plan for curing postconfirmation defaults. The court rejects that argument, stating that it sees no logical reason why an original plan could not contain such a provision. The court gives as an example a provision authorizing the cure of a subsequent failure to make payment by the default date in a mortgage by making such payment within five days after the default date.

The creditor in *Hoggle* also argued that such a provision in an original plan, permitting in effect an anticipatory modification to cure a postconfirmation default, would violate the dual requirements of § 1322(b)(5) for "maintenance of payments" and cure within a "reasonable time." The court rejects the argument, again citing the example of an automatic five day cure period after default. The court, however, at that point in its opinion, makes clear the limited scope of its holding, as follows:

> [Creditor] does not contend that the particular modifications in the instant case constitute an abuse of discretion. Nor does [creditor] argue that the amortization scheme approved in this case—the missed confirmation payment was amortized over the balance of the term of the plan—constituted a waiver of a payment and thus failed to satisfy the required "maintenance of payments." Rather, [creditor] argues that in no case could a cure of a postconfirmation default satisfy § 1322(b)(5)'s "maintenance of payments" and "reasonable time" requirements. Thus, we do not address the issue of whether the district court abused its discretion in approving the instant modification. Nor do we address the issue of whether the "maintenance of payments" requirement is satisfied by allowing a payment to be deferred and amortized over the balance of the term of the plan; that issue was not fairly presented either in the district court or on appeal.

*Hoggle,* 12 F.3d at 1011, n. 4.

The *Hoggle* court then determines that "[r]eading the statutory scheme to permit the cure of any defaults, even those occurring postconfirmation, falls within the letter and spirit of the statutory scheme, according the flexibility Congress intended for homeowners

---

**16.** Section 1329, in material part, permits modification of a confirmed Chapter 13 plan before completion of payments upon request of the debtor, the trustee, or the holder of an allowed unsecured claim: To increase or reduce the amount of payments on claims of a particular class provided for by the plan; to extend or reduce the time for such payments; or to alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan.

**17.** Citing *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) and *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982).

**18.** *See* 5 *Collier on Bankruptcy,* ¶ 1322.09[1], at 1322–19 (15th Ed.1993).

in proposing and modifying their Chapter 13 plans." *Hoggle,* 12 F.3d at 1011.

The court goes further, however, in explaining its ruling, as follows:

> This solution does not, as [creditor] urges, deprive the home lender of protection. The Bankruptcy Court possesses ample powers to prevent successive or abusive attempted modifications. *See, e.g.,* 11 U.S.C. § 105(a). Further, each modification must comply with the requirements outlined in § 1329, including adherence to § 1322(b)(5). Therefore, in each instance where the debtor proposes a postconfirmation modification, a judicial inquiry should be undertaken to determine whether a proposed modification to cure a default will comport with § 1322(b)(5)'s requirements that such a cure be effected within a reasonable time and simultaneously maintain payments on the long term loan.

*Hoggle,* 12 F.3d at 1011–12.

■ This court is in complete agreement with the analysis and conclusions of the *Hoggle* court, including its determinations regarding protection of home lenders from successive or abusive modifications. It is not altogether clear, however, whether the *Hoggle* court would require that a judicial inquiry into adherence with the requirements of § 1322(b)(5) be undertaken in cases where proper notice of the proposed action was given and no party in interest raised an objection. This court does not believe that a hearing should be required in such a case.

The home lender may not stand idly by and rely upon the trustee or the court to protect its rights. If it does so, and the proposed modification is ultimately approved, whether or not after hearing and over objection, it will be bound, as was the creditor in *Rogers,* and as is Liberty in this case, by the provisions of the plan as modified, under principles of *res judicata.*

The court should not be expected or required to hold a hearing on and fully adjudicate each request for modification in order to cure a postpetition default under § 1322(b)(5), if proper notice of the nature and extent of what is proposed pursuant to the modification has been given to all parties in interest and no objection is heard. To require otherwise would constitute an inappropriate and wasteful use of judicial resources, and would be unnecessarily contrary to § 102(1).[19]

■ This court has set out, in *Rogers,* what it believes constitute appropriate solutions to the problem of postpetition defaults in most of the cases in which the problem addressed in this case exists. That is not to say that the court countenances postpetition defaults by debtors upon their obligations, including those which they have undertaken in connection with a Chapter 13 plan. Unless a debtor can establish that a postconfirmation default was due to circumstances unforeseen and reasonably unforeseeable at the time of confirmation, modification of the confirmed plan to cure that default should not be granted over the objection of a party in interest who has been or will be adversely affected. Similarly, if debtors are unable to explain and justify postpetition defaults which occur prior to confirmation, the court may consider such defaults as evidence that the plan may not be feasible; i.e., that the debtor may not be able to make all payments required by the plan, at least in instances where an objection to confirmation has been filed.[20]

■ After a hearing in a contested request for modification, the court may determine that modification should be permitted, but that the circumstances require that the order

---

**19.** Section 102 provides rules of construction for terms used in the Bankruptcy Code. Section 102(1) is as follows:

(1) "after notice and a hearing", or a similar phrase—

(A) means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances; but

(B) authorizes an act without an actual hearing if such notice is given properly and if—

(I) such a hearing is not requested timely by a party in interest; or

(Ii) there is insufficient time for a hearing to be commenced before such act must be done, and the court authorizes such act.

**20.** *See* § 1325(a)(6).

condition the grant of authority, provide protections for the creditor, or both. In that event, the court possesses ample authority to fashion appropriate remedies under virtually any set of circumstances, as necessary, in order to grant relief to debtors and afford protection to creditors.[21]

For the reasons set forth herein, the motion of Liberty for relief from the automatic stay, for abandonment of property, and alternatively for adequate protection, will be denied.

IT IS SO ORDERED.