**In re Michael L. JONES, Debtor.**

**Michael L. Jones, Plaintiff,**

**v.**

**Wells Fargo Home Mortgage, Defendant.**

**Bankruptcy No. 03–16518.**
**Adversary No. 06–01093.**

United States Bankruptcy Court, E.D. Louisiana.

April 13, 2007.

---

Allan L. Ronquillo, DeLeo & Ronquillo, L.L.P., Mandeville, LA, for Plaintiff.

Herschel C. Adcock, Jr., Baton Rouge, LA, Joseph Paul Rumage, Jr., New Orleans, LA, for Defendant.

## MEMORANDUM OPINION

ELIZABETH W. MAGNER,
Bankruptcy Judge.

This matter came before the Court on Michael L. Jones' ("Debtor") Complaint to Recover Property of the Estate, filed against Wells Fargo Home Mortgage, Inc. ("Wells Fargo"). Defendant Wells Fargo filed a timely Answer, and on January 5, 2007, the Court conducted a trial on the merits. Entering appearances at the trial were:

Robin R. DeLeo

Allan Ronquillo

Counsel for debtor, Michael L. Jones

Joseph Paul Rumage, Jr.

Counsel for Wells Fargo

At the conclusion of the trial, the parties were given leave to submit post-trial briefs on or before February 1, 2007, after which the Court took the matter under advisement. The Court having considered the pleadings, evidence presented, and arguments of counsel, issues the following Memorandum Opinion.

## Jurisdiction

This Court has jurisdiction over the issues presented pursuant to 28 U.S.C. §§ 157 and 1334; 11 U.S.C. §§ 362, 506, 1306, 1322, and 1328; Bankruptcy Rule 2016.

## I. Factual Findings

Debtor filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code on August 26, 2003. At the time of his filing, Debtor was obligated to Wells Fargo on a debt secured by his residence. Prior to the institution of this case, Wells Fargo had filed a foreclosure action against Debtor in State Court. After this case was filed, Wells Fargo stayed the prosecution of the foreclosure action but did not dismiss its suit. It also filed a proof of claim setting forth the amounts owed by Debtor as of the petition date. The proof of claim contained a schedule reflecting the following prepetition amounts as due:

| | | |
|---|---|---:|
| 1. | Eight (8) mortgage payments totaling [1] | $18,796.19 |
| 2. | Accrued late charges | 823.04 |
| 3. | Foreclosure fees | 750.00 |
| 4. | Court costs | 1283.87 |
| 5. | Inspection fees | 60.00 |
| 6. | Escrow shortage | 111.59 |
| 7. | Broker's price opinion charges | 435.00 |
| Total | | $22,259.69 |

Attached to the proof of claim was a copy of an adjustable rate note dated April 4, 2001, evidencing the Wells Fargo debt ("Wells Fargo Note").[2]

Debtor's plan of reorganization provided for payments to the Chapter 13 Trustee ("Trustee") of $2,105.35 per month for thirty-six months followed by a final payment of $625.97. From these payments, Wells Fargo was to be repaid on the prepetition arrearage represented by Wells Fargo's proof of claim.[3] Debtor also agreed to make the monthly installment payments arising postpetition under the Wells Fargo Note directly to Wells Fargo. Debtor's

---

1. The proof of claim listed installments due for the months of January 2003–April 2003 at $2.561.83 per month, May 2003's installment was scheduled for $2,125.30; and those due for June 2003–August 2003 at $2,141.19 per month. The Wells Fargo Note had an interest rate that adjusted on April 1 and October 1 potentially changing the monthly note payments due the following May or November, respectively. Contractual installments were comprised of interest accrued in arrears from the previous month on the outstanding principal balance then due, plus a principal payment and escrow contribution. Joint Trial Exhibit ("Exh.") 1.

2. Exh. 2.

3. The plan provided that arrears of $22,259.69 would be paid through the Trustee. Claim no. 1.

plan was confirmed by this Court on October 28, 2003.[4]

On November 1, 2003, Debtor suffered a heart attack. As a result of his illness, Debtor failed to make three payments to the Trustee under the plan and missed four mortgage payments to Wells Fargo. By Order of this Court, the term of Debtor's plan was extended three months, and his obligation to immediately make the three missed payments was excused.[5] By Consent Order with Wells Fargo, Debtor agreed to pay $9,348.22, including $650.00 in attorney's fees and costs incurred by Wells Fargo,[6] to cure the postpetition default (the "Consent Order Sum") on his mortgage. These amounts were to be paid directly by Debtor to Wells Fargo.[7]

Thereafter, Debtor made payments to both the Trustee and Wells Fargo. The Trustee forwarded payments to Wells Fargo to pay its prepetition arrearage.[8]

In August of 2005, Debtor filed a motion requesting authority from the Court to refinance the Wells Fargo debt. Debtor represented that he had a commitment from Option One in the amount of $275,000.00: a sum sufficient to satisfy the costs of refinancing, outstanding claims of Wells Fargo, and pay off the remaining obligations due under his plan. As a re-

sult of Hurricane Katrina, a hearing on the motion was delayed until November 15, 2005. Wells Fargo did not oppose the motion. On December 7, 2005, this Court approved the request for authority to refinance the Wells Fargo debt.[9] On December 15, 2005, Debtor requested a payoff of the amounts due under the Wells Fargo Note as a closing on the refinancing was scheduled for January 4, 2006.[10] On January 3, 2006, Wells Fargo faxed a payoff statement to Winters Title, the closing notary, indicating a payoff balance of $231,463.97. The payoff was itemized:

| | | |
|---|---|---|
| 1. | Principal due | $210,920.72 |
| 2. | Interest due from July 1, 2005—January 10, 2006 | 13,801.58 |
| 3. | Sheriff's Commissions | 6,741.67 |
| | Total | $231,463.97 [11] |

No explanation or substantiation for the amounts owed accompanied the payoff statement.

Debtor testified that when he received the payoff statement he contacted his counsel. Although Debtor questioned the amounts Wells Fargo alleged were due, he was unable to obtain an accounting from Wells Fargo explaining its calculations or any other substantiation for the payoff. Because the new loan could not be closed without a release of the Wells Fargo mortgage, and the mortgage would not be re-

---

4. Docket nos. 4 and 7.

5. The Order authorizing the modification to Debtor's plan was signed on December 16, 2003. Docket no. 14.

6. It is unclear how Wells Fargo arrived at the Consent Order Sum. However, as Wells Fargo represented to Debtor, the Trustee, and Court that this sum was necessary to satisfy the outstanding obligations due for the four missed installment payments and said sum was memorialized by a Court Order prepared by Well Fargo and consented to by Debtor, it will be accepted.

7. The Consent Order was signed on May 12, 2004 and amended on July 16, 2004. Docket nos. 8 and 71. Debtor satisfied the Consent

Order Sum by making a lump sum payment, credited by Wells Fargo on May 25, 2003, in the amount of $4,355.08. Thereafter, Debtor forwarded amounts over and above his mortgage payment until the remaining balance on the Consent Order Sum was satisfied. Exh. 8.

8. Exh. 16.

9. Docket no. 9.

10. Trial representation by Paul Rummage, trial counsel for Wells Fargo.

11. Exh. 4.

leased by Wells Fargo unless it received its payoff demand, Debtor was forced to remit the sums demanded or lose his loan commitment.[12] The refinancing left insufficient funds, after the satisfaction of refinancing costs and Wells Fargo's payoff, to satisfy any of Debtor's remaining obligations under the plan.

Following the closing, Debtor requested an accounting of the amounts Wells Fargo alleged were due to payoff his debt. On January 12, 2006, Wells Fargo wrote Debtor acknowledging that it had collected sums in excess of the amounts necessary to satisfy the loan. Wells Fargo gave no explanation as to how much was due or why the amounts collected were in excess of the amounts owed. Debtor was advised that in "approximately 15 days" a check would be issued to him in reimbursement for the excess amount paid.[13]

On March 30, 2006, Debtor instituted this adversary proceeding when no reimbursement was received. Thereafter, on April 20, 2006, Wells Fargo forwarded $7,598.64 in reimbursement for excess funds collected.[14] The funds received were placed in the registry of the Court pending the outcome of this adversary proceeding. At trial, Wells Fargo offered into evidence an accounting from the date of the loan's inception to payoff, reflecting charges made against the loan, as well as, the amounts received in payment.[15]

Debtor disputes the accounting. In particular, Debtor disputes the accrual and payment of post petition inspection fees, attorney's fees, and statutory expenses as well as prepetition Sheriff's commissions. Debtor also objects to the calculation of interest under the Wells Fargo Note. Debtor alleges, and it has not been challenged by Wells Fargo, that none of the disputed charges were previously disclosed to Debtor, the Court, or the Trustee. Further, in the case of the $6,741.67 in Sheriff's commissions collected from the proceeds of the January 4, 2006, refinancing, Debtor avers that Wells Fargo represented in its proof of claim that the costs and commissions of the foreclosure were only $1,283.87. This sum was included in his plan and paid by the Trustee. As a result, Debtor avers that the inclusion of an additional $6,741.67 in commissions in the Wells Fargo payoff was unwarranted and unauthorized.

Wells Fargo responds that the amounts claimed were correctly calculated and that any charges assessed postpetition were authorized under the terms of the Wells Fargo Note and other security documents evidencing the loan. It further maintains that because Debtor voluntarily paid the sums owed under the Wells Fargo Note, he may not recover any amounts improperly charged.

## II. Law and Analysis

### A. Calculation of Amounts Due Under the Wells Fargo Note

The indebtedness due to Wells Fargo is represented by an adjustable rate note dated April 4, 2001. The interest rate on the Wells Fargo Note is based on a published financial index plus 8.25%.[16] The

---

12. Tr.T. Jones, 69:20–70:6.

13. Exh. 10.

14. Exh. 13.

15. Exh. 8.

16. The index rate is the average of interbank offered rates for six month U.S. dollar-de-nominated deposits in the London market ("LIBOR") as published in The Wall Street Journal. The interest rate was subject to adjustment beginning on April 1, 2003 and continuing every six months thereafter. The most recent index figure available as of the first business day of the month immediately preceding April 1 or October 1, depending on the date of adjustment, was utilized. To this index rate, 8.25% was added. Exh. 2.

initial interest rate was 12.375%, but the Wells Fargo Note was subject to adjustment beginning on April 1, 2003, and every six months thereafter. However, under the Wells Fargo Note the interest rate was in no event to be greater than 15.375% nor less than 12.375%. If the rate were to change, Wells Fargo was required to notify Debtor in writing.

Despite the terms of the Wells Fargo Note, the interest rate charged from April 1, 2003, through April 1, 2005, was lower than the contractual floor rate. During a review of Debtor's loan records, Wells Fargo discovered this error and in a letter dated November 30, 2005, agreed to waive any claim for additional interest.[17] Since the rate in effect at the time the error was discovered was equal to the floor rate of interest under the Wells Fargo Note, no adjustment to Debtor's existing installment payment amount was necessary.

In the accounting prepared by Wells Fargo and presented at trial, Wells Fargo applied Debtor's direct postpetition installment payments to those payments owed prepetition. This was in derogation of the plan, which required that the payment satisfy postpetition installments.

Wells Fargo's accounting did not reflect its agreement that four installments and attorney's fees would be paid through an agreed figure of $9,348.22 under the Consent Order. Wells Fargo's accounting also failed to recognize that prepetition charges, fees, and missed payments were to be separately paid by the Trustee under the plan and did not bear interest. All of these mistakes had the combined effect of increasing the interest charged and paid on the loan above that actually due.

The historical rates charged on this debt are:

| | |
|---|---|
| April 1, 2001–March 31, 2003 | 12.375% |
| April 1, 2003–September 30, 2003 | 9.625% [18] |
| October 1, 2003–March 31, 2004 | 9.500% [19] |
| April 1, 2004–September 30, 2004 | 9.375% [20] |
| October 1, 2004–March 31, 2005 | 10.375% [21] |
| April 1, 2005–January 4, 2006 | 12.375% [22] |

It is important for the Court to note at this juncture how prepetition past due

---

**17.** Exh. 7.

**18.** On March 7, 2003, Wells Fargo notified Debtor that the interest rate on the Wells Fargo Note was to change effective April 1, 2003. According to Wells Fargo, the new rate was 9.625%. Thereafter, beginning with the May 1, 2003 payment, Wells Fargo calculated Debtor's new payment as $2,137.95. Exh. 6.

**19.** On September 8, 2003, Wells Fargo notified Debtor that the interest rate on the Wells Fargo Note would again change effective October 1, 2003. According to Wells Fargo, Debtor's new rate was 9.5%, and his adjusted payment, beginning on November 1, 2003, was $2,123.77. Exh. 6.

**20.** On March 8, 2004, Wells Fargo notified Debtor that the interest rate on the Wells Fargo Note was again changing, effective April 1, 2004. According to Wells Fargo, the new rate was 9.375%, which resulted in a new payment amount of $2,104.98 effective May 1, 2004. Exh. 6.

**21.** On September 7, 2004, Wells Fargo notified Debtor that the interest rate on the Wells Fargo Note was adjusting, effective October 1, 2004. According to Wells Fargo, the new rate was 10.375%, and his new installment payment was $2,429.86, beginning on November 1, 2004. Exh. 6.

**22.** Finally, on March 7, 2005, Wells Fargo notified Debtor that the interest rate on the Wells Fargo Note was changing, effective April 1, 2005. According to Wells Fargo, the new rate was 12.375%. Beginning with the May 1, 2004, payment, Wells Fargo calculated Debtor's new installment to be $2,748.07. The rate did not change on October 1, 2005, as confirmed by letter dated September 6, 2005, from Wells Fargo; however, the installment was adjusted to $2,610.23, presumably as a result of reductions in the amounts needed to satisfy future demands against the escrow account. Exh. 6.

debt and installments accruing postpetition are satisfied under this and most plans. In their plans, debtors commit a single monthly payment from which the Trustee pays administrative, priority, secured, and unsecured claims. Included in the amount to be paid by the Trustee are past due amounts owed to secured lenders.[23] The prepetition past due amounts do not bear interest postpetition and are paid out over the life of the plan in installments calculated by the Trustee.[24] The precise allocation between the various constituencies of any one payment made by the debtor is left to the Trustee. As a result, Wells Fargo often received payments from the Trustee in differing amounts delivered in less than predictable intervals.[25]

The repayment of a prepetition arrearage is generally a simple calculation that begins with the amount claimed by the creditor in its proof of claim. That amount is reduced by the Trustee's payments until paid in full.

As for the postpetition debt, the confirmation of a plan recalibrates the amounts owed by Debtor as of the petition date. Because the prepetition arrearage is paid by the Trustee under the plan, Debtor's account gets a fresh start, free of all past due sums.[26] Thus, going forward, Debtor's balance should only reflect the principal amount due under the Wells Fargo Note as of the petition date, and all other charges, fees, or negative escrow balances should be zero.

In this Court's experience, few, if any, lenders make the adjustments necessary to properly account for a reorganized debt repayment plan. As a result, it is common to see late charges, fees, and other expenses assessed to a debtor's loan as a result of postpetition accounting mistakes made by lenders. If the lender does not recalibrate the loan to reflect the terms of the plan, more likely than not, it will miscalculate the amounts due by a debtor. It appears to this Court that lenders refuse to make these adjustments because few debtors challenge their accounting and even less pay out their entire loan before discharge. There are also a sizeable number of debtors that default on their plans or the direct postpetition payments on their loans, resulting in the lifting of the automatic stay and a return to foreclosure. Thus, many lenders appear to take a "wait and see" attitude rather than provide the type of individualized administration that a reorganized debt requires.

Such was the case with Wells Fargo. Rather than recalibrate the loan as current on the petition date, Wells Fargo continued to carry the past due amounts contained in its proof of claim in Debtor's loan balance. Wells Fargo applied any amounts received, regardless of source or intended application, to pre and postpetition charges, interest and noninterest bearing debt. This resulted in such a tangled mess that neither Debtor, who is a

**23.** 11 U.S.C. § 1322 and Fed. R. Bankr.P. 3001.

**24.** Prepetition past due amounts owed to a secured claimant like Wells Fargo are rarely paid with interest. The reason is simple, the bulk of most claims consists of past due interest accrued in the form of missed installment payments. Since the repayment of interest cannot bear interest under Louisiana law, lenders are not allowed to request that these past due sums bear interest until paid. 11 U.S.C. § 1322(e) and La.C.C. art.2001.

**25.** At trial, Wells Fargo asserted that the failure of the Trustee to deliver plan payments to it as provided by the plan constitutes a default under the plan and Wells Fargo loan documents. The Fifth Circuit has held that a debtor is not responsible for the way a trustee disburses payments. *See, In re Lee,* 167 B.R. 417 (Bank.S.D.Miss.1992) *aff'd,* 22 F.3d 1094 (5th Cir.1994).

**26.** *See, e.g., Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

certified public accountant, nor Wells Fargo's own representative could fully understand or explain the accounting offered.[27]

### 1. *Prepetition Debt Calculation*

A review of Wells Fargo's accounting from the date of the loan's inception until the petition date reveals several accounting errors. These errors can be generally described as: 1) simple mathematical errors and 2) mistakes in the amount Wells Fargo reported were incurred. There do not appear to be any errors caused by an improper calculation of interest as the loan's effective interest rate was constant through the date the last prepetition payment was received in December of 2002.

The first mistake in the calculation of the prepetition arrearage involved Wells Fargo's representations as to the amount of foreclosure costs it incurred. Wells Fargo alleged in its proof of claim that it had incurred $1,283.87 in prepetition foreclosure costs. At trial, the Sheriff's representative testified that the sum of $1,283.87 was the *deposit* made by Wells Fargo on the institution of the foreclosure action. The actual costs incurred as a result of the foreclosure were only $743.87.[28] The Sheriff's representative testified that had Wells Fargo requested an accounting of the costs, one would have been supplied. The Sheriff also testified that if the foreclosure suit had been dismissed on the petition date, no commissions or other charges would have been due, and the Sheriff would have refunded

the unused portion of the deposit.[29] As a result, Wells Fargo's proof of claim contained errors as to this charge, and this Court has reduced that figure to reflect prepetition foreclosure costs of $743.87, not the $1,283.87 claimed.

Calculation errors also resulted in the inclusion of $435.00 in broker's price opinion fees (only $250.00 were actually due at filing) and an escrow shortage of $111.59, when the escrow account had an actual shortage of $546.94. Both of these items have also been adjusted to reflect the actual amounts due, as calculated through Wells Fargo's own accounting and the testimony taken at trial.[30]

One final adjustment was also made to the total past due installments owed prepetition. As previously explained in footnote one (fn.1), the eight (8) installments included in the Wells Fargo proof of claim are the aggregate of accrued interest, principal, and escrow contributions. However, since the escrow account was kept current postpetition through Debtor's direct payments, and the negative prepetition balance was separately itemized and included in the proof of claim, there is no need for Wells Fargo to include additional escrow contributions as part of the prepetition installment payments owed under the plan. Additionally, the portion of the installments designed to amortize principal should not be included in the prepetition arrearage amount because the full principal balance was also paid postpetition. To collect any principal or escrow payments

---

27. The Court notes for the record that Debtor's counsel propounded written discovery and interrogatories on Wells Fargo's accounting before trial and conducted a pretrial deposition of Wells Fargo's representative, the same person that testified at trial. Despite these efforts, Wells Fargo was still unclear and unknowledgeable about the calculation of its own debt history, often offering new explanations and facts on the stand from those given during discovery.

28. Tr.T. Sandra Williams, 149:3–13.

29. Tr.T. Williams, 145:21–146:12

30. Exh. 8. Under the terms of Wells Fargo's loan documents, payments are first applied to accrued and outstanding interest, then principal, then escrow charges. Fees and other expenses are satisfied only after all outstanding installment payments are paid and escrow charges are current.

from the Trustee (as part of the prepetition past due installments) would result in an overpayment of principal and escrow. Therefore, the prepetition installments have been reduced to eliminate escrow and principal repayment and now only provide for past due interest.[31]

Attached as Exhibit "A" to this Opinion is a schedule reflecting the prepetition loan history for this debt and the amounts actually due as of the petition date. On Exhibit "B," also attached to this Opinion, are the past due amounts owed as of the petition date (as reflected at the conclusion of Exhibit "A") reduced for the payments made by the Trustee. The end result is that as of January 4, 2006, Wells Fargo was owed a prepetition past due balance of $2,251.21.

### 2. Assessment of Additional Prepetition Charges

Wells Fargo has also added to its prepetition arrearage, without amendment to its proof of claim or disclosure to the Trustee or Court, additional prepetition charges. As previously stated, Wells Fargo's prepetition arrearage was calculated based on its proof of claim and included in

Debtor's confirmed plan. Nevertheless, when Wells Fargo learned of the refinancing and a payoff quote was requested, it added additional Sheriff's commissions to its debt based on the amounts it anticipated receiving.[32]

After receiving the tender of payoff, Wells Fargo contacted the Sheriff and requested a calculation of the commissions owed. The Sheriff's office based its fee on the information communicated to it by Wells Fargo, that the payoff of the Wells Fargo loan was as a result of refinancing. Wells Fargo failed to advise the Sheriff that a bankruptcy had been previously filed. If that information had been delivered to the Sheriff, his representative's testimony was that all commissions would have been waived because no commissions are assessed on writs of seizure if a bankruptcy is filed prior to the Sheriff's sale.[33] As a result of this error, the Sheriff's commission of $6,741.67 was improperly added to Debtor's loan account and collected at closing.

### 3. Calculation of Postpetition Debt

Starting on August 26, 2003, Debtor's loan was current. From that date for-

---

**31.** Wells Fargo's representative could not explain how interest was calculated in the accounting Wells Fargo supplied. The Court's review of Wells Fargo's accounting reveals that interest was calculated by applying the applicable interest rate on the full outstanding principal balance due at the time a payment was applied for a 360 day year. The Court's interest calculations have adopted this formula. Exh. 8.

**32.** Under state law, Sheriffs may assess a commission against amounts the secured lenders receive after seizure of a property. The calculation of commissions varies from parish to parish based on the Sheriff's interpretation of the phrase "received as a result of seizure." Wells Fargo assumed the most expansive of views, that any sums received on its loan from any source would result in a commission due to the Sheriff.

**33.** Had Wells Fargo dismissed its foreclosure action upon the institution of this case, this problem would have never occurred. Wells Fargo did not dismiss the foreclosure because it wanted to save itself the time and additional expense should a default occur postpetition, resulting in a return to foreclosure. The stay of a pending foreclosure action during a bankruptcy's administration might result in the imposition of additional fees or expenses against even a fully performing debtor, depending on the position taken by the local sheriff. In this case, the Sheriff did not seek to impose any additional fees or commissions. The Court leaves for another day how it will address the consequences of a lender's postpetition maintenance of a foreclosure action that results in additional costs to a debtor or the estate.

ward, Debtor's past due account was "zeroed out" because the arrearage was payable through the plan. Therefore, Debtor's postpetition balance consisted of only principal, or $213,949.06, and Debtor's next installment was due for September 1, 2003.[34]

Initially, Debtor's case did not go well. Because Debtor suffered a heart attack in November 2003, he immediately fell behind in his direct payments to Wells Fargo. These payments were aggregated into the Consent Order Sum, once again bringing Debtor's account current by agreement.

Wells Fargo's subsequent actions, however, caused Debtor to pay almost $13,000.00 in additional interest charges over the life of the plan. Throughout the succeeding years, Debtor made his payments in the amounts directed by Wells Fargo. However, rather than apply the amounts received to the postpetition installments for which they were intended, Wells Fargo applied them to prepetition installments, prepetition costs or fees, and postpetition charges not authorized or disclosed to Debtor, the Court, or the Trustee.

The error began with the application of Debtor's payments to prepetition debt. Wells Fargo's proof of claim correctly reflects past due installment payments for the months of January through August 2003. Postpetition, Debtor owed the installment for September 1, 2003. That installment was to bear interest at the rate of 9.625%. Instead, Wells Fargo, in its accounting, applied Debtor's September 2003 payment to the prepetition installment due for January 1, 2003. The amounts due for September 2003 and January 2003 were substantially different because of the different interest rates

charged during the two periods. In January, Debtor's installment was higher simply because a higher rate of interest (12.375%) was in effect. Debtor's payment of the September 2003 was insufficient to satisfy the January 2003 installment because it was never intended to pay the earlier installment. By applying the payment intended for the September 2003 installment payment to the January 2003 installment three problems occurred: 1) the payment was insufficient to satisfy the amounts due for January 2003; 2) a postpetition default occurred on the loan because the payment was not correctly applied; and 3) Wells Fargo collected additional interest to which it was not entitled. The collection of additional interest occurred because Wells Fargo had already made a claim for this same installment in its proof of claim. Therefore, the Trustee was already scheduling payments to Wells Fargo to satisfy this earlier installment. By taking a payment due for September 2003 at a lower interest rate and applying it to a payment at a higher rate, while still collecting from the Trustee the higher interest bearing installment, Wells Fargo denied Debtor the benefit of the lower rate by collecting two installments at the higher rate.[35]

On October 1, 2003, the rate in effect on the Wells Fargo Note was 9.5%. Wells Fargo advised Debtor of the rate change and that his new monthly payments were $2,123.77.[36] On December 31, 2003, Wells Fargo received two payments from Debtor in the total amount of $4,247.54. The amount received was intended to pay the installments of November and December 2003. However, instead of applying the payments to the November and December 2003 installments, Wells Fargo applied part of the funds to the prepetition install-

---

34. Exh. 8

35. Exh. 8.

36. Exh. 6.

ment due for February 1, 2003; a payment already included in the prepetition arrearage to be satisfied under the plan. The February 2003 payment carried a higher interest rate than that applicable to the November or December 2003 installment payments.[37] Therefore, in effect, Wells Fargo collected two installment payments for February 2003, one from the Trustee and one from the Debtor. Both were at the higher interest rate.

There was an additional problem with the December double payment. Because the payment was insufficient to satisfy two early 2003 installments (the amount of those installments being about $200.00 higher than the two due at the end of the same year) after Wells Fargo applied the funds to the February payment, it placed the remaining funds in a suspense account rather than apply those funds to the outstanding loan.[38] This had the effect of making the Debtor past due on his postpetition installments. It also kept the outstanding principal balance artificially higher than it should have been because a payment was not applied. The failure to reduce principal ultimately affected the calculation of future interest, making interest payments higher than what was actually owed.

This same error was compounded month after month throughout the loan's postpetition history. Additional accounting errors were committed by the misapplication of the Trustee's payments to postpetition charges and loan installments. The result was the addition of significant interest charges not really due and a loan balance out of sync with the actual amounts owed.

4. *Assessment of Postpetition Fees and Charges*

a. Postpetition, Preconfirmation Fees

■ Postpetition charges incurred prior to confirmation may be included in the debts necessary to cure a default under a plan.[39] Therefore, they must be disclosed and are subject to review by the bankruptcy court for reasonableness.[40] According to Wells Fargo's accounting, Wells Fargo assessed $150.00 in attorney's fees postpetition, but prior to confirmation. However until discovery was conducted some three years later, they were never disclosed. The attorney's fees were unwittingly paid by Debtor through the application of either Trustee payments or Debtor's direct mortgage payments, neither of which were designated for this purpose.

Legal fees incurred postpetition and prior to confirmation must be approved by the Court as reasonable under § 506(b) and Bankruptcy Rule 2016(a). Preconfirmation, postpetition fees are proven by application. Bankruptcy Rule 2016(a) mandates that "an entity seeking compensation for services or reimbursement for expenses shall file an application setting forth a *detailed* statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." [41]

---

37. Exh. 8

38. Exh. 8.

39. *See, Mendoza v Temple–Inland Mortgage Corp. (In re Mendoza),* 111 F.3d 1264 (5th Cir.1997).

40. *See, Rake v. Wade,* 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993); *In re Telfair,* 216 F.3d 1333 (11th Cir.2000); 11 U.S.C. §§ 506(b) and 1322(e).

41. *In re Hudson Shipbuilders, Inc.,* 794 F.2d 1051 (5th Cir.1986); *In re Allen,* 215 B.R. 503 (Bankr.W.D.Tex.1997); *In re Tate,* 253 B.R. 653, 665 (Bankr.W.D.N.C.2000); *In re Gifford,* 256 B.R. 661 (Bankr.D.Conn.2000). The only postpetition attorney's fees, costs or other charges for which Wells Fargo received Court approval were those related to the Motion for Relief from Stay.

■ At trial, Wells Fargo offered no evidence as to the nature of the fees or their reasonableness. It neglected to produce invoices identifying the counsel who performed the services or any description regarding the services performed, time spent, or amounts charged. Wells Fargo simply failed to meet its burden of proof on this issue.[42] Therefore, the attorney's fees not previously approved by the Court and identified on Wells Fargo's accounting as owed postpetition and preconfirmation are denied.[43]

### b. Post Confirmation Fees and Charges

At the outset, the Court notes that Wells Fargo has charged Debtor's account, post confirmation, with previously undisclosed attorney's fees, inspection charges, and a "statutory expense." These fees were accrued and paid from amounts delivered by the Trustee to satisfy Debtor's arrearage claim or from direct mortgage installment payments of Debtor tendered to satisfy principal, accrued interest, and escrow charges. Only after the institution of this adversary did Debtor discover, through discovery, the existence of these charges as they were not previously disclosed on any statement, coupon, or notice to Debtor, nor were they identified for the Trustee or Court. The diversion of Trustee and Debtor payments to satisfy these charges caused a corresponding deficiency in Debtor's plan and postpetition balance. Because Wells Fargo has not only charged Debtor's account with undisclosed post confirmation charges, *but satisfied* those charges with estate funds delivered to it to pay other debt, there can be no doubt that Wells Fargo's assessment of post confirmation attorney's fees and expenses directly relates to Debtor's estate. This is because any amounts charged will "correspondingly enlarge the debt of the estate, make reorganization more difficult for the debtor, and adversely impact upon the claims of the remaining creditors." [44]

■ The application of Trustee and Debtor's monthly mortgage installments to additional, undisclosed charges diverted payments ordered by this Court under the confirmation of Debtor's plan to satisfy other debt. There is no doubt that Wells Fargo's satisfaction of these heretofore undisclosed fees and charges was from property of the estate and directly impacted the status of Debtor's plan. Since Wells Fargo seeks satisfaction of post confirmation charges from property of Debtor's estate, albeit after the fact, the Court has jurisdiction over this request, including whether or not the claims are appropriate under applicable law.

Additionally, under Fifth Circuit jurisprudence, post confirmation fees and charges may be added to a prepetition arrearage and satisfied under a modified plan.[45] Reasoning that under § 1322(b)(3)

---

**42.** *See, In re Ransom,* 361 B.R. 895 (Bankr.D.Mont.2007)(noting creditor has burden of proof to establish the reasonableness of fees and costs), *see also, In re Hudson Shipbuilders. Inc.,* 794 F.2d 1051 (5th Cir.1986).

**43.** The fees are described as $150.00 in bankruptcy counsel fees.

**44.** *In re Hudson Shipbuilders, Inc.,* 794 F.2d 1051, 1055 (5th Cir.1986).

**45.** *Mendoza v Temple–Inland Mortgage Corp. (Matter of Mendoza),* 111 F.3d 1264 (5th Cir. 1997); *see also, Green Tree Acceptance, Inc. v Hoggle (In re Hoggle),* 12 F.3d 1008 (11th

Cir.1994); *Metmor Fin., Inc v. Bailey (In re Bailey),* 111 B.R. 151 (W.D.Tenn.1988); *In re Binder,* 224 B.R. 483 (Bankr.D.Colo.1998); *In re Steele,* 182 B.R. 284 (Bankr.W.D.Okla. 1995); *In re Bellinger,* 179 B.R. 220, 223 (Bankr.D.Idaho 1995); *In re Comans,* 164 B.R. 539 (Bankr.S.D.Miss.1994); *Central Bank v. Thomas (In re Thomas),* 121 B.R. 94 (Bankr.N.D.Ala.1990); *In re Gadlen,* 110 B.R. 341 (Bankr.W.D.Tenn.1990); *In re Davis,* 110 B.R. 834 (Bankr.W.D.Tenn.1989); *In re McCollum,* 76 B.R. 797 (Bankr.D.Or.1987); *In re Minick,* 63 B.R. 440 (Bankr.D.D.C. 1986); *In re Parker,* 46 B.R. 106 (Bankr. N.D.Ga.1985); *In re Canipe,* 20 B.R. 81

and (5) a debtor can cure any default through a plan, the Fifth Circuit provided that modification of a debtor's confirmed plan could cure post confirmation defaults, including fees and charges imposed as a result of post confirmation breaches of a debtor's loan agreements. As such, it is imperative that debtors be advised when post confirmation fees and charges are being assessed against their accounts. As at least one court has explained,

> Creditors should not be able to assess fees to the account of a person in bankruptcy without the person's knowledge. A bankruptcy case's purpose is to allow a debtor to get out of financial trouble. At discharge, a debtor ought to be able to expect he or she has brought his or her secured debts current and wiped out all unsecured debts not paid through a plan. Undisclosed fees prevent a debtor from paying the fees in his or her plan- an option that should not be lost simply because a creditor chooses to not list the fee and expects to collect it later.[46]

Post confirmation, debtors have at least three options regarding the payment of accruing post confirmation charges. The charges can be paid through a modified plan, deferred until completion of the case, or voluntarily paid outside of the plan. However, in order for a debtor to exercise his choice, the post confirmation fees and charges must be disclosed. The right to modify a plan for post confirmation defaults is meaningless if a lender can decide which fees and charges it will disclose and which it will hide until the case is complete and execution on debtor's collateral can be accomplished. Post confirmation charges, if not disclosed, could also thwart the real purpose of a bankruptcy case. A debtor that completes his plan by paying off his lender's entire arrearage and postpetition installments may find himself in foreclosure the day after a discharge is granted, based on unpaid and undisclosed post confirmation charges and fees. This result is clearly at odds with the notion of providing a successful debtor a fresh start.

For the above reasons, this Court has the authority to review the post confirmation expenses assessed by Wells Fargo against Debtor and address the challenges raised by Debtor to their payment.

■ Fees and charges incurred post confirmation in connection with a loan over Debtor's residence are not governed by 11 U.S.C. § 506(b). The Supreme Court, in *Rake v. Wade*,[47] held that 11 U.S.C. § 506(b) "applies only from the date of filing through the confirmation date."[48] Therefore, a creditor's right to assess postpetition attorney's fees and charges is prescribed by state law and the terms of its contract with Debtor. Unless allowed under state law and Wells Fargo's documents, no fee or charge may be assessed.

The postpetition, postconfirmation charges and fees assessed by Wells Fargo are itemized as: 1) attorney's fees,[49] 2) statutory expenses,[50] and 3) inspection

---

(Bankr.W.D.N.C.1982); *In re Ford*, 84 B.R. 40 (Bankr.E.D.Pa.1988).

**46.** *In re Harris*, Case Nos. 96–14029–MAM, 00–11321–MAM, Adv. No. 99–1144 at *5 (Bankr.S.D.Ala. May 10, 2002) (Text available at <www.alsb.uscourts.gov>).

**47.** 508 U.S. 464, 468, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993).

**48.** *See also, Telfair v. First Union*, 216 F.3d 1333, 1338 (11th Cir.2000).

**49.** Attorney's fees assessed post confirmation were $659.61 and $857.81 in November and December of 2003. Legal fees and costs in the amount of $650.00 assessed in August of 2004 were approved by the Court under the Consent Order and included in the Consent Order Sum. They have not been removed from the accounting.

**50.** A statutory expense of $106.58 was charged and paid in August of 2003.

charges.[51] Under the terms of the Wells Fargo Note and mortgage, Wells Fargo was entitled to charge Debtor's account for attorney's fees and inspection charges incurred in connection with the loan.[52] Beyond the actual right to charge the amounts requested, the Wells Fargo documents also require that the assessments be reasonable. *See,* Exh. 2, Mortgage of Wells Fargo, page 8, ¶ 7 (Lender or its agent may make reasonable inspections of the property), page 8, ¶ 9 (if borrower fails to perform or if there is a significant proceeding that may affect lender's rights such as bankruptcy, lender may do *whatever is reasonable* to protect its interests in the property and borrower will be obligated to reimburse lender for said expenses, including reasonable attorney's fees); Wells Fargo Note, ¶ 9, (borrower commits to reimburse lender for costs of collection including *reasonable* attorney's fees.)(emphasis supplied).

■ Under Louisiana law, the creditor bears the burden of establishing its debt.[53] Additionally, the fees and charges must be reasonable. The right to seek reimbursement for a charge is not the equivalent of an unfettered right to assess the charge against the loan. For example, Louisiana law provides that attorney's fees and charges may be contractually authorized, but even if contractually allowed, their assessment must be reasonable.[54] Thus, both under the terms of the Wells Fargo Note and mortgage and Louisiana law, this Court reviews the charges and fees assessed for reasonableness.

■ At trial, Wells Fargo offered no evidence as to the nature of the attorney's fees imposed post confirmation or their reasonableness. It neglected to produce invoices identifying the counsel who performed the services or any description regarding the services performed, time spent, or amounts charged. As a result, the Court cannot determine the reasonableness of the fees incurred because the Court was given no evidence as to what services were performed, much less, why they were necessary. Wells Fargo simply failed to meet its burden of proof on this issue. Therefore, the attorney's fees not previously approved by the Court and identified on Wells Fargo's accounting as owed post confirmation are denied.

At trial, Wells Fargo offered no explanation or evidence to support its "statutory charge" of $106.58. Therefore, it is also disallowed.

Following the institution of this case, Wells Fargo ordered sixteen (16) inspections against Debtor's property during the twenty-nine (29) months the case was pending and Wells Fargo's debt remained outstanding. Wells Fargo testified that, upon default, the employee in charge of administering the loan had discretion to order an inspection as often as he or she deemed advisable. Wells Fargo also testified that once a bankruptcy is filed, the loan is considered to be in default whether or not any amounts are actually past due. It also admitted that inspections are not performed on all property subject to bankruptcy administration. No other criteria

---

**51.** Inspection charges were assessed against this loan on October 14 and November 4 of 2003; January 8, February 17, March 5, April 5, May 7, June 4, July 7, August 9, and September 28 of 2004; September 29, 2005; and January 30, 2005. The inspection charges total $225.00.

**52.** Exh. 2.

**53.** *See,* La. C.C. art. 1831.

**54.** *See, Central Progressive Bank v. Bradley,* 502 So.2d 1017 (La.1987); *Wuertz v. Tobias,* 512 So.2d 1209 (La.App. 5th Cir.1987); and *City of Baton Rouge v. Stauffer Chemical Company,* 500 So.2d 397 (La.1987).

or parameters for requiring an inspection were delineated.

Following the filing of the bankruptcy petition,[55] Wells Fargo performed monthly inspections beginning in October 2003 and continuing until September 2004. Reports delivered as a result of these inspections, were admitted into evidence. Throughout this period, the reports reflect that the property was generally in good condition. In fact, there is little to no change in the property's condition from month to month reflected in the reporting. Under questioning by Debtor's counsel, Wells Fargo's representative could not list a single reason why an inspection would have been ordered postpetition, nor could she detail any reason why continuous monthly monitoring of the property was necessary or reasonable. Wells Fargo appears to have no policy guidelines regarding the taking of inspections, and its representative could offer nothing approximating a justification for same.

■ Wells Fargo bears the burden of establishing that the charges it seeks to impose against Debtor's loan are reasonable. Based on the testimony of Wells Fargo and the inspection reports offered into evidence, this Court concludes that Wells Fargo has failed to meet its burden. Wells Fargo did not show that Debtor's property was improperly maintained, nor did it show that Debtor had a history of failure to maintain his property.[56] The

inspection reports change little from month to month, and nothing in them gives cause for concern. Thus, nothing in the reports justified continued monitoring. Given Wells Fargo's failure to explain the necessity of the services or their reasonableness, the charges may not be assessed against Debtor's account.

Exhibit "C" to this Opinion, reflects the post filing loan history for this debt after taking into account the above findings. All postpetition charges not previously approved by the Court and denied as set forth in this Opinion, have been removed from the history.

Debtor's postpetition balance, as reflected on Exhibit "C", was $204,762.11.[57] As can be seen from the accounting, one installment payment was due, and the escrow account had a positive balance.

**B. Recovery of Amounts Paid for Postpetition Charges and Damages for Violation of the Stay**

Section 1306 defines property of the estate, and provides:

(a) Property of the estate includes, in addition to the property specified in section 541 of this title-

(1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted . . . .; and

---

**55.** In the four months leading up to the bankruptcy, Wells Fargo conducted monthly inspections of its collateral and charged Debtor a fee for this service. It also secured a broker's price opinion on the property which presumably entailed a drive-by review of the property. These charges indicate that Wells Fargo was fully aware of the property's condition at the time the bankruptcy case was filed.

**56.** Two additional inspection charges were assessed against the loan in September 2005 and January 2006. The inspection in Septem-

ber followed Hurricane Katrina and would have been reasonable except the inspector's report indicates that the inspection was not conducted because access to the property was impossible. The inspection charge in January of 2006 was incurred after the refinancing and payoff were requested. As a result, neither inspection charge was appropriate.

**57.** This sum includes outstanding principal of $211,222.39, less a positive escrow of $8,638.51, plus accrued interest of $2,178.23 for December 2005.

(2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed or converted . . . .

In order to confirm a plan, a chapter 13 debtor must commit his projected disposable income to the satisfaction of claims. Projected disposable income is all income earned by debtor, less expenses allowed for the necessary and reasonable costs of his support and that of his family.[58] A debtor's disposable income may fluctuate during the course of the plan's administration based on a change in the debtor's earnings or expenses.[59] The calculation of Debtor's disposable income includes the installment payments accruing post confirmation on Wells Fargo's loan. However, the amounts due by Debtor do not include an allowance for additional fees and costs. Thus, when Wells Fargo applies any portion of Debtor's earnings to undisclosed fees and charges, rather than the installments owed under the note and payable under the plan, it reduces Debtor's ability to pay either the reasonable and necessary costs of his support or the amounts due under his plan. As such, Wells Fargo's satisfaction of postpetition charges constitutes a taking of property of the estate and impacts the Debtor's ability to comply with the terms of the plan.

Bankruptcy Code section 362(a) provides that, notwithstanding certain exceptions, the filing of a bankruptcy petition operates as a stay, applicable to all entities, of . . .

(3) any act to obtain possession of the property of the estate or of property from the estate or to exercise control over property of the estate;

\*　　\*　　\*　　\*　　\*　　\*

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title . . .

The automatic stay helps protect a debtor's assets by preventing creditors from scrambling to obtain as much property of the debtor's estate as possible. Additionally, the stay gives the debtor breathing room so he or she can institute an organized repayment plan allowing for equitable disbursement among the creditors.[60] Debtor alleges that Wells Fargo violated sections 362(a)(3) and (6) by assessing and paying for undisclosed post confirmation charges from property of the estate. Further, by overstating the payoff, Wells Fargo collected estate funds to which it was not entitled and deprived Debtor, and the creditors of this estate, access to property sufficient to satisfy the plan. Debtor further asserts that said stay violations were willful and that he is entitled to recover fees, costs, and damages under 11 U.S.C. § 362(h).

■ Section 362(h) provides, "[a]n individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." The Fifth Circuit noted that there are "three elements to a claim under 362(h): (1) the defendant must have known of the existence of the stay; (2) the defendant's acts must have been intentional; and (3) these acts must have violated the stay."[61] For the reasons explained below, this Court finds that Wells Fargo's actions constitute a wilful violation of the automatic stay.

---

58. 11 U.S.C. §§ 707(b) and 1325(b).

59. *See,* 11 U.S.C. § 1329; *In re Devilliers,* 358 B.R. 849 (Bankr.E.D.La.2007).

60. *See, In re Chesnut,* 422 F.3d 298, 301 (5th Cir.2005).

61. *In re Chesnut,* 422 F.3d at 302.

### 1. *Violations of the Stay*

Wells Fargo charged Debtor's account with unreasonable fees and costs; failed to notify Debtor that any of these postpetition charges were being added to his account; failed to seek Court approval for same; and paid itself out of estate funds delivered to it for the payment of other debt. All of this was accomplished without notifying anyone, Debtor, the Trustee, or the Court, that Wells Fargo was assessing postpetition charges and diverting estate funds for their satisfaction.

The contractual right to seek reimbursement is not the equivalent of a right to collect an undisclosed charge from the estate.[62] While Wells Fargo argues that the accrual of fees is not a violation of the automatic stay, the application of estate funds to their payment without Court authority is clearly a violation. In this instance, Wells Fargo assessed *and paid* itself for additional pre and postpetition charges from payments designed to satisfy a prepetition arrearage contained in its proof of claim and accruing postpetition installment payments. The payments were tendered by Debtor or Trustee for the specific purposes outlined in Debtor's plan and authorized by the Order confirming same. Wells Fargo had absolutely no right to divert these payments to other obligations without Court authority.

The filing of a bankruptcy is supposed to be a respite for a debtor, allowing time for reorganization. It stops the accrual of unnecessary fees and costs as well as additional interest and charges on past due amounts in an effort to allow debtors a fresh start. The automatic stay prohibits the collection of any amounts owed by a debtor during the administration of the case in order to effect these goals.[63] Therefore, Wells Fargo's failure to disclose other fees or request permission of the Court to seek their payment from estate property resulted in an illegal collection of fees not due from estate property and violated the automatic stay.[64]

### 2. *Recovery of Amounts Collected in Violation of the Stay*

Louisiana Civil Code art. 2299 provides that a person receiving payment of a thing not owed is bound to restore it. Louisiana Civil Code art. 2302 states that a person who receives that which is not due is obliged to return it. Numerous Louisiana cases hold that even a payor's negligence in making a payment will not bar his claim for recovery of an amount not due.[65] *In*

---

**62.** *See, In re Campbell,* 361 B.R. 831 (Bankr. S.D.Tex.2007).

**63.** *See, e.g., Matter of S.I. Acquisition, Inc.,* 817 F.2d 1142 (5th Cir.1987).

**64.** *See, In re Han,* 333 B.R. 881 (Bankr.N.D.Fla.2005)(creditor violated automatic stay by charging debtor a higher interest rate than provided by note); *see also, In re Campbell,* 361 B.R. 831 (Bankr.S.D.Tex.2007)(creditor violated automatic stay when it collected prepetition property taxes through postpetition payments); *In re Chesnut,* 422 F.3d 298 (5th Cir.2005)(finding that the automatic stay has broad application and that creditor should seek court permission before seizing property that is arguably not property of debtor's estate); *but c.f. Mann v. Chase Manhattan Mortgage Corp.,* 316 F.3d 1(1st Cir.2003)(no stay violation

when creditor kept fees and costs in its books but made no attempt to collect said charges from debtors).

**65.** *See e.g. Gootee Constr., Inc. v. Amwest Sur. Ins. Co.,* 856 So.2d 1203 (La.2003); *Tischler v. City of Alexandria,* 471 So.2d 1099 (La.App. 3rd Cir.1985); *Williams v. Bank of Louisiana in New Orleans,* 454 So.2d 1138 (La.App. 4th Cir.1984); *Pioneer Bank & Trust Co. v. Dean's Copy Prods., Inc.,* 441 So.2d 1234 (La.App. 2nd Cir.1983); *Jackson v. State, Teachers' Ret. Sys. of La.,* 407 So.2d 416 (La.App. 1st Cir. 1981); and *DeVillier v. Highlands Ins. Co.,* 389 So.2d 1133 (La.App. 3rd. Cir.1980). Federal jurisprudence on the issue includes *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.,* 352 F.3d 254 (5th Cir.2003); *Owl Constr. Co., Inc. v. Ronald Adams Contractor. Inc.,* 642 F.Supp. 475 (E.D.La.1986).

the Matter of Ark–La–Tex Timber Co., Inc,[66] recently decided by the Court of Appeals for the Fifth Circuit, cited this principle with approval.

As set forth above, the Sheriff's commissions added to Wells Fargo's payoff were not due. Their inclusion in a payoff delivered the day before the refinancing left Debtor no time to verify or question the propriety of the charges. No detail was provided with the payoff, and although Debtor attempted to verbally verify the amounts claimed, no information could be accessed through Wells Fargo. Rather than lose his refinancing, Debtor closed the new loan.[67] The payment of Sheriff's commissions was clearly an amount that was not owed,[68] and Wells Fargo is obligated to provide for its return. The other postpetition charges and fees are similarly reimbursable since Wells Fargo did not disclose their imposition or payment to Debtor at any point in time prior to the institution of this adversary proceeding. After they were brought to light during discovery, they were successfully challenged at trial. The result is that they too were not due and reimbursement is owed to Debtor.

In its post trial brief, Wells Fargo argues that it is irrelevant whether or not these charges are actually due because Debtor has forfeited the right to reclaim the amounts owed. Ignoring the applicable Civil Code articles on the subject, Wells Fargo bases its position on a jurisprudential rule set forth in New Orleans &

N.E.R. Co. v. Louisiana Const. & Imp. Co.[69] That rule states "if a party, with full knowledge of the facts, voluntarily pays a demand unjustly made on him and attempted to be enforced by legal proceedings, he cannot recover the money, as paid by compulsion, unless there be fraud in the party enforcing the claim and a knowledge that the claim is unjust." (emphasis added).[70]

The New Orleans & N.E.R. Co. case involved the seizure of several vessels for wharfage fees associated with improvements made by the defendant, Louisiana Construction. While the case was pending, a similar but separate suit involving the same type of fees was decided at trial in favor of Louisiana Construction and upheld on appeal. As a result of this adverse ruling, a third party non-owner, New Orleans & N.E.R. Co., decided to pay the wharfage fees "under protest" in order to secure the release of the vessels. The seizures were lifted and New Orleans & N.E.R. Co. then instituted suit for reimbursement. The Supreme Court announced its jurisprudential rule based on New Orleans & N.E.R. Co.'s failure to assert its defenses to payment during the pendency of the original suit in admiralty. Explaining that the purpose of the rule was to end litigation and protect the finality of settlement, the Court refused to allow a third party to re-litigate issues presented in the first action. As the Court noted, the time to raise defense to payment was during the first suit where the

---

66. 482 F.3d 319 (5th Cir.2007).

67. Under these circumstances the Court finds that Debtor's payment of the disputed fees and charges was not voluntary or knowing.

68. It is worth noting that the Sheriff's representative was a *Wells Fargo witness*. Presumably, Wells Fargo knew of the content of the Sheriff's testimony long before trial. Yet Wells Fargo has not offered to reimburse the commissions it erroneously collected or re-

quest, on its own accord, a court order directing their repayment by the Sheriff to Debtor. At trial, the Sheriff's office expressed a willingness to refund the commissions erroneously paid. Incredibly, Wells Fargo continues to insist that the commissions were due even in the face of testimony from the Sheriff that they were improperly paid!

69. 109 La. 13, 33 So. 51 (1902).

70. *Id.* at 55.

parties had access to the court and the issues were joined.

This rule is easily distinguishable from the case at hand. First, there was no pending action at the time Debtor made his payments to Wells Fargo. Debtor's bankruptcy is not a "pending action" for the purposes of this rule as it did not adjudicate the financial accuracy of Wells Fargo's loan, nor was this issue ever before the Court. Second, as Debtor's testimony made clear, he did not have full knowledge of the facts involving all the charges, interest and expenses assessed. Wells Fargo has admitted that, except for the inclusion of the additional Sheriff's commission in its payoff statement, it did not disclose any of the additional fees and charges to Debtor at any point in time. For these reasons, Debtor's payment of additional interest, postpetition attorney's fees, inspection fees, and unspecified statutory charges does not fall within the principles enunciated in *New Orleans & N.E.R. Co.* As for the imposition of additional Sheriff's commissions, the Court finds that because there was no pending litigation regarding the propriety of the charges at the time the payment was made, the jurisprudential rule of *New Orleans & N.E.R. Co.* is inapplicable. Therefore, Wells Fargo will be ordered to return all previously assessed and disallowed charges and fees.

### 3. *Damages for Violation of Stay*

As noted above, under § 362(h), Debtor is entitled to recover actual damages, including costs and attorneys' fees, if he was injured by any willful stay violation. A willful violation does not require a specific intent to violate the stay, as the statute provides for damages if Wells Fargo knew of the automatic stay and its actions were intentional.[71] This Court finds that Wells Fargo knew of the stay and that its actions were wilful. Wells Fargo participated in the bankruptcy by filing a proof of claim and by filing a Motion to Lift Stay when Debtor fell behind in his mortgage payments. Additionally, this Court finds that Wells Fargo intentionally assessed and collected fees and costs against Debtor's account postpetition and without Court authority. Its intent was apparent at trial as it defiantly proclaimed its right to not only assess, but collect from estate property, substantial fees and charges without notifying anyone, Debtor, the Trustee or the Court.

Wells Fargo avers that it was Debtor's burden to discover that it had clandestinely assessed and paid itself for undisclosed fees and charges, miscalculated interest and added into the loan charges otherwise not due. Incredibly, Wells Fargo also argues that it was Debtor's burden to verify that its accounting was correct, even though Wells Fargo failed to disclose the details of that accounting until it was sued. It took no responsibility for any of its mistakes or errors, nor did it apologize for the delays experienced in obtaining the poor accounting it finally produced.[72] This position completely absolves Wells Fargo from any duty to the Court or Debtor for an accurate and correct accounting of amounts it claims are due as well as its responsibility to the Court to only claim sums to which it is entitled under its documents and the Bankruptcy Code.

Wells Fargo's position is untenable and unworkable. Bankruptcy courts can not function if secured lenders are allowed to

---

71. *In re Chesnut*, 422 F.3d 298, 302 (5th Cir. 2005).

72. Wells Fargo, as the lender, holds the primary responsibility for keeping accurate records. *See, In re Parrish*, 326 B.R. 708, 721 (Bankr.N.D.Ohio 2005), and *In re Jacobson*, 5 B.R. 274, 277 (Bankr.D.S.D.1980).

assess postpetition fees without disclosure and then divert estate funds to their satisfaction without court approval. Plans of reorganization and confirmation orders are based on court approved schedules to repay debts disclosed at confirmation and sworn by the creditor to be owed under penalty of perjury. It is unconscionable that a lender would represent a certain debt was due, allow debtor to base his repayment plan on that sum, and then arbitrarily and without notice change the amounts owed without disclosure or amendment to its proof of claim. It is equally disturbing that in clear derogation of the Bankruptcy Code, lenders would add additional attorney's fees and charges to a loan without court approval, and again without disclosure to any interested party.

The final assault on the Bankruptcy Court is Wells Fargo's position that not only can it secretly assess a debtor's account postpetition, but it can *collect* payment on these charges, without seeking Court permission, from payments intended for the satisfaction of other court approved debt. If this position were sanctioned, the Court could never be certain that implementation of a plan would be in accordance with its terms. Depending on how much and how often the lender syphoned off funds, payable under a confirmed plan for other purposes, a debtor might or might not satisfy the obligations contemplated by his or her plan. To allow such a practice is to eviscerate the provisions of the automatic stay and this Court's power to protect Debtor and property of the estate.[73]

Wells Fargo's position challenges the Court's authority to seek reimbursement of sums clearly not due (illegally assessed interest and Sheriff's commissions), as well as sums not authorized (postpetition attorney's fees), those not reasonably owed (inspection fees), and those as yet unexplained (statutory fees). The Court has already addressed the merits of Wells Fargo's charges. The Court, may recover property of the estate [74] and sanction those that appear before it for violations of its orders.[75] Wells Fargo has violated the automatic stay and defiantly refused to return funds which it has no right to hold.

### III. Insurance Escrow

As a final note, Wells Fargo included in its accounting the details of an insurance escrow it maintained for Debtor's benefit. Following Hurricane Katrina and prior to the payoff, Wells Fargo received insurance proceeds as a result of damages to Debtor's home. These proceeds were placed in a separate insurance escrow and disbursed to Debtor as repairs were made. The Court notes that according to Wells Fargo's accounting, $68.06 remains owing to Debtor on this account and should be immediately disbursed.[76]

**73.** *In re Rathe,* 114 B.R. 253 (Bankr.D.Idaho 1990)(Creditor may not apply plan or direct payments other than as set forth in the confirmed plan. Application of payments to post confirmation charges without court permission constitutes a collateral attack on the order of confirmation).

**74.** *See, U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983)(ordering IRS to turn over seized property determined to be property of estate); *Matter of Wischan,* 77 F.3d 875 (5th Cir. 1996); *see also,* 11 U.S.C. §§ 105(a), 541, 542(a), and 1306.

**75.** *See, Matter of Terrebonne Fuel & Lube, Inc.,* 108 F.3d 609 (5th Cir.1997); *see also, In re Hardy,* 97 F.3d 1384 (11th Cir.1996); *In re Rainbow Magazine, Inc.,* 77 F.3d 278 (9th Cir.1996); *In re Power Recovery Systems, Inc.,* 950 F.2d 798 (1st Cir.1991); *In re Skinner,* 917 F.2d 444 (10th Cir.1990); *In re Walters,* 868 F.2d 665 (4th Cir.1989). *In re Mooney* 340 B.R. 351, 360 (Bankr.E.D.Tex.2006), *In re Cherry,* 247 B.R. 176 (Bankr.E.D.Va.2000).

**76.** See Exhibit "D."

## IV. Conclusion

For the above stated reasons, this Court determines that the amount owed by Debtor on the loan as of January 4, 2006, was $207,013.32 [77] and that the collection of $231,463.97 from Debtor at the closing of his refinancing was substantially in excess of the sums due. As a result, Wells Fargo owed Debtor the full sum of $24,450.65 as of January 4, 2006. Since $7,598.64 was returned on April 20, 2006, a remaining balance of $16,852.01 is still outstanding and due to Debtor. For the reasons set forth above, Wells Fargo will be ordered to return the sum of $16,852.01 in accordance with this Opinion. The amounts due will bear interest at the legal rate from date of judicial demand until paid in full. [78]

Debtor's request for damages incurred as a loss of personal time are denied because he did not prove at trial that he suffered any monetary loss as a result of the time he spent working. [79] Although Debtor testified that he spent nights and weekends working on this matter, there was no testimony that he missed work or incurred a loss of income due to the time he spent.

However, since the collection of these sums was far in excess of the amounts reasonably necessary to satisfy this loan; Wells Fargo collected both pre and postpetition charges from property of the estate without authorization and in contravention of several court orders including, but not limited to, the automatic stay imposed by 11 U.S.C. § 362 and the Order confirming Debtor's plan of reorganization; Wells Fargo delayed returning Debtor's property for over one year; failed to provide a reasonable accounting of the loan history from which the correct amounts due could have been ascertained; and improperly applied payments from the Trustee and Debtor resulting in significant additional and unwarranted interest charges; this Court will consider an award for sanctions for violation of the automatic stay and its Order of confirmation at a separate hearing.

---

77. The payoff is calculated by taking $211,222.39 in principal, deducting a positive escrow balance of $8,638.51 and adding accrued and unpaid interest of $2,178.23 for the month of December, 2005. To this sum is added the amounts remaining on the prepetition arrearage of $2,251.21 for a total of $207,013.32.

78. *See, e.g., In re Henry,* 266 B.R. 457, 480 (Bankr.C.D.Cal.2001)(Awarding interest in addition to compensatory damages under 362(h)). Legal interest will be charged on the $7,598.64 from March 30, 2006 until paid on April 20, 2006. Legal interest will be charged on the remaining judgment from March 30, 2006 until paid in full.

79. *See, In re Riser,* 298 B.R. 469 (Bankr. M.D.Fla.2003).